# United States Court of Appeals

## For the First Circuit

No. 10-2423

OFFICEMAX, INC.,

Plaintiff, Appellee,

v.

DAVID A. LEVESQUE, and DANA RATTRAY,

Defendants, Appellants,

COUNTY QWIK PRINT, INC., d/b/a/ CQP Office Solutions,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Thompson, Circuit Judges,

and Saris,* District Judge.

Edward W. Gould with whom Joseph M. Bethony was on brief for appellants.
Kindra L. Hansen with whom John Byron Flood, Russell B. Pierce, Jr., and Danielle Yvonne Vanderzanden were on brief for appellee.

September 12, 2011

---

* Of the District of Massachusetts, sitting by designation.

**SARIS**, **District Judge**. Appellants David A. Levesque and Dana Rattray challenge the district court's issuance of a preliminary injunction sought by their former employer OfficeMax, Inc. ("OfficeMax") to enforce noncompetition agreements barring them from working in office supply sales in or around Aroostook County, Maine. See OfficeMax Inc. v. County Qwick Print, Inc., 751 F. Supp. 2d 221, 252 (D. Me. 2010). The appellants argue that, under the plain language of the agreements, the one-year noncompetition period was triggered in 1996, when OfficeMax's predecessor in interest purchased all of the shares of the appellants' employer. We agree. The preliminary injunction is VACATED, and the case is REMANDED to the district court.[1]

## I. Background

The following background facts are derived from the district court's orders[2] and are largely uncontested for the purposes of this appeal.

In the early 1980s, the appellants were employed by a small company called Fitzgerald Office Supplies. In 1994,

---

[1]     We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1). There is diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and the parties do not dispute that Maine law applies.

[2]     The district court issued two relevant orders. See OfficeMax Inc. v. County Qwick Print, Inc., 751 F. Supp.2d 221 (D. Me. 2010) (allowing preliminary injunction); OfficeMax Inc. v. County Qwick Print, Inc., 709 F. Supp. 2d 100 (D. Me. 2010) (denying motion for a temporary restraining order).

Fitzgerald became Loring, Short, and Harmon ("LS&H"). In February 1996, Boise Cascade Office Products Corporation ("BCOP") purchased all of LS&H's shares. In anticipation of the purchase, BCOP asked LS&H to solicit Confidential Information and Noncompetition Agreements (the "agreements") from the appellants.[3] Among other things, the agreements bound the appellants to refrain from disclosing confidential information or trade secrets acquired during employment at LS&H. Most important for the purpose of this dispute, Paragraph 4 of the agreements states in relevant part:

> For a period of <u>12 months after termination of my employment with LS&H</u> (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not, either for my own purposes or as an employee of or for the benefit of any other entity or person in a capacity that directly or indirectly includes responsibility for developing and maintaining customer relationships, engage in the sale or distribution of office supplies, office furniture, or related office products or services, engage in the sale of janitorial supplies, or otherwise engage in the type of work that I presently perform for LS&H within sixty (60) miles of any county in which I performed services for LS&H in the 12 months prior to my termination of employment. In agreeing to this restriction, I specifically acknowledge the substantial value to LS&H of my customer contacts and agree that such contacts constitute goodwill and a protectible interest of LS&H.

(emphasis added). Also relevant, Paragraph 6 provides:

> I agree that this Agreement shall be freely assignable by LS&H to BCOP in the event of and upon the closing of the sale of stock of LS&H to BCOP. I further agree that if requested by BCOP, and for the consideration stated above, I will sign a noncompetition agreement in

---

[3]    According to Section 8.9 of the Stock Purchase Agreement, the agreements were "in a form. . . provided by BCOP."

-3-

substantially the same form as this Agreement and which names BCOP as the employer.

In the preamble, the agreements explain that they were signed in anticipation of the purchase of LS&H:

I understand that [BCOP] plans to purchase [LS&H]. I execute this Agreement in contemplation of that transaction, knowing that LS&H is tendering the consideration on behalf of BCOP and intending that my obligations, duties, and promises in this Agreement are for the benefit of BCOP and in the expectation that I will be offered, and if offered I will accept, employment with BCOP after the closing of the transaction. In consideration of the sum of $2,500, which has been paid to me by LS&H, I agree to the following[.]

As consideration for signing the agreements, LS&H paid each of the appellants $2,500 two days prior to the execution of the share purchase agreement between BCOP and LS&H's shareholders. Soon after execution of the agreements, LS&H physically delivered the agreements to BCOP, and BCOP reimbursed LS&H for the consideration paid to the appellants.[4]

Upon completion of BCOP's purchase of LS&H, the appellants accepted employment with BCOP. Soon after, the appellants assert that BCOP offered them separate noncompetition agreements, which the appellants refused to sign. They both continued to work at BCOP until its subsequent merger with

---

[4] The district court found that this conduct, along with the Stock Purchase Agreement, constituted assignment of the agreements from LS&H to BCOP. OfficeMax Inc., 751 F. Supp. 2d at 240-41. The appellants challenge this finding, but because we find that even if the agreements were assigned, the stock purchase triggered the one-year noncompetition period, we need not address this issue.

OfficeMax.[5]  After the merger, OfficeMax offered the appellants positions on the OfficeMax sales team.  Appellants say that OfficeMax similarly asked them to sign noncompetition agreements with OfficeMax but that they again refused.

In 2009, OfficeMax terminated Levesque due to corporate reorganization.  In early 2010, Rattray resigned from his position.  After leaving their employment with OfficeMax, the appellants began working together for County Qwick Print.  At first they focused mainly on printing services, but soon they began doing much of the same office supply sales work as they had done at their previous employments, servicing many of the same customers, and working in the same region in which they worked for OfficeMax.

OfficeMax moved for a preliminary injunction preventing the appellants from engaging in the sale of office supplies.  The district court found that OfficeMax had established a likelihood of success on the merits, that the noncompetition clauses in the agreements still covered the employees, that these agreements were validly assigned by LS&H to BCOP, and that OfficeMax acquired the agreements as successor by merger to BCOP.  The district court also found that OfficeMax had demonstrated that it would suffer irreparable harm if the appellants continued competing in the sale

[5]   BCOP changed its name to OfficeMax Contract, Inc. in October 2004. OfficeMax Inc., 751 F. Supp. 2d at 242. OfficeMax Contract, Inc. subsequently merged into OfficeMax, Inc. in December 2006. Id.

of office supplies and that the balance of equities supported the issuance of a preliminary injunction. See OfficeMax, Inc., 751 F. Supp. 2d. at 248-49.

## II. Analysis

A district court's decision to grant a preliminary injunction is reviewed for abuse of discretion. See Waldron v. George Weston Bakeries Inc., 570 F.3d 5, 8 (1st Cir. 2009). Within this ambit, findings of fact are reviewed for clear error and issues of law are reviewed de novo. See Braintree Labs., Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 41 (1st Cir. 2010). "While the decision to grant or deny a preliminary injunction is reversible only for an abuse of discretion, an incorrect finding of law in determining the likelihood of success on the merits is not within the district court's discretion." Paris v. Dep't of Housing & Urban Dev., 843 F.2d 561, 574 (1st Cir. 1988). Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a "question of law" that is reviewed de novo. See Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000).

The key issue here is whether the appellants' termination of employment at OfficeMax triggers the running of the one-year noncompetition period, or whether the period was triggered by BCOP's purchase of LS&H. Appellants contend that the language "termination of my employment with LS&H" in Paragraph 4 of the

-6-

agreements should be interpreted to mean that the appellants' completion of employment with LS&H, which occurred at the stock sale, initiated the running of the one-year noncompetition period. Under this interpretation, even if BCOP and then OfficeMax acquired the rights to the agreements, the noncompetition clauses lapsed around February 1997. OfficeMax argues, and the district court agreed, that the valid assignment of the agreements to BCOP not only gave BCOP the rights to enforce the agreements but also set termination of employment with BCOP, which later merged with OfficeMax, as the triggering event for the one-year noncompetition agreement.

Though neither side argues that the agreements are ambiguous, under Maine law, we must address this question first. See Halco v. Davey, 919 A.2d 626, 629 (Me. 2007) ("When interpreting whether a contractual provision was breached, courts must first determine as a matter of law whether the provision is ambiguous."). "When a contract is reasonably subject to two or more interpretations, or its meaning is unclear, it is ambiguous." Waltman & Co. v. Leavitt, 722 A.2d 862, 864 (Me. 1999). "The fact that parties have different views of what an agreement means does not render it ambiguous." Champagne v. Victory Homes, Inc., 897 A.2d 803, 806 (Me. 2006). Although OfficeMax presses hard for an interpretation that the noncompetition agreements were triggered by the appellants' termination of employment at OfficeMax, the

language of the agreements, read as a whole, unambiguously compels the appellants' interpretation.

In most cases, where contractual language has a plain, generally accepted meaning, it should be interpreted in accordance with that meaning. See Reliance Nat. Indem. v. Knowles Indus. Serv., Corp., 868 A.2d 220, 228 (Me. 2005) ("Interpretation of an unambiguous provision. . .is given its plain, ordinary, and generally accepted meaning." (internal quotation marks and citation omitted)); see also Restatement (Second) of Contracts § 202(3)(a) ("[W]here language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). Paragraph 4 sets "termination of employment with LS&H" as the triggering event for the running of the noncompetition agreement. Both BCOP and LS&H were aware of the imminence of the share sale, and yet Paragraph 4 refers solely to employment with LS&H, rather than termination of employment with LS&H or any of its successors or assigns. The plain language of this provision sets the completion of employment with LS&H, and solely LS&H, as the triggering event for the running of the noncompetition period.

This interpretation of Paragraph 4 is consistent with the agreements read as a whole. See In re Estate of Barrows, 945 A.2d 1217, 1221 (Me. 2008). Paragraph 6 of the agreements indicates that BCOP might solicit noncompetition agreements of "substantially the same form" as the agreements at issue here and requires

-8-

appellants to sign new agreements, "which name[] BCOP as the employer," if requested by BCOP. The district court deemed this sentence to be a "contingent clause" that did not "requir[e] a new Agreement in order to maintain enforceability." OfficeMax Inc., 709 F. Supp. 2d at 110. This interpretation is reasonable to the extent that it recognizes that, after assignment, BCOP could enforce the agreements for one year after the stock sale without acquiring new agreements. However, if the appellants owed a duty not to compete for one year after their termination from BCOP, there would be no reason for BCOP to seek new noncompetition agreements of "substantially the same form" as the agreements between the employees and LS&H, as BCOP would have all of the same benefits under the contract that LS&H had initially acquired. The district court's interpretation, therefore, reads this clause out of the contract in contravention of the fundamental principle of contract interpretation that "a contract should be construed to give force and effect to all of its provisions and not in a way that renders any of its provisions meaningless." Am. Protection Ins. Co. v. Acadia Ins. Co., 814 A.2d 989, 993 (Me. 2003) (internal quotation marks and citation omitted).

Still, OfficeMax argues for an alternative interpretation based in part upon the considerable, undisputed evidence that all of the parties, including the appellants, understood that these agreements were signed for the benefit of BCOP. As the agreements

themselves explain, the appellants were aware that BCOP planned to purchase the shares of LS&H and that LS&H "intend[ed] that [the employees'] obligations, duties, and promises in this Agreement are for the benefit of BCOP and in the expectation that [the employees] will be offered, and if offered . . . will accept, employment with BCOP after the closing of the transaction." Further, Paragraph 6 expressly allows for such an assignment.

These features of the agreements do not affect the interpretation of Paragraph 4 read in the context of the agreements as a whole. As a legal matter, assignment of the agreements could not have altered the appellants' substantive duties under the agreements' terms. See Goldberg Realty Group v. Weinstein, 669 A.2d 187, 191 (Me. 1996); Chadwick-BaRoss v. Martin Marietta Corp., 483 A.2d 711, 715 (Me. 1984) ("A contractual right can be assigned unless the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract." (quoting Restatement (Second) of Contracts § 317(2)(a))). Though assignment of the agreements to BCOP may have substituted the party that could enforce the agreements, it could not have changed the triggering date of the noncompetition clause.

Further, it made sense for the parties to set termination of employment with LS&H as the triggering event, even though this was likely to occur soon after the agreements' execution. Although

the agreements envision the "expectation" that the appellants would be offered employment contracts with BCOP, continued employment was not guaranteed. In this context, the agreements prevent competition from these employees for a year after the purchase of LS&H to allow BCOP time to secure its own sales representatives and build up sufficient customer good will to withstand any future competition from either of the appellants. See OfficeMax Inc. v. W.B. Mason Co., Inc., No. 2:11-cv-21, 2011 WL 2173789, at *3 (D. Vt. June 2, 2011) (interpreting nearly identical language and finding that the fact that the agreement was signed for the benefit of BCOP was consistent with an interpretation that "the contract's intended purpose may have been to provide temporary protection for BCOP before and for a short time after the stock sale").

OfficeMax suggests that the plain language reading urged by the appellants renders the contract nonsensical and absurd. See Northern Ins. Co. of New York v. Point Judith Marina, LLC, 579 F.3d 61, 72-73 (1st Cir. 2009) (applying Rhode Island law); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). It argues that if the termination from LS&H were the triggering date, then the appellants would have been contractually prohibited from performing their duties for BCOP until a year after BCOP had purchased LS&H's shares, in clear

-11-

conflict with BCOP's intent to rehire the employees immediately after the purchase of LS&H. Along with Paragraph 4, Paragraphs 1 and 2 of the agreements are implicated by this argument. Paragraph 1 provides that the employee has a "duty to develop and maintain good relationships between LS&H and its customers," and Paragraph 2 provides that confidential information acquired during employment with LS&H shall "not [be] divulge[d] . . . to any person, firm, or institution, except as such disclosure is a necessary part of a bona fide merchandise sale negotiation with an actual or potential LS&H customer." If the employees' substantive duties under the contract ran only to the benefit of LS&H, then, OfficeMax argues, the appellants would have been in violation of the terms of the agreement the split second they began working for BCOP.

This argument ignores the fact that the parties intended that BCOP would be assigned LS&H's rights to enforce these agreements. Even if the appellants were in technical violation of the terms of the noncompetition clause during the first year of their employment with BCOP, BCOP was the only party that could have enforced these prohibitions. With all parties understanding that LS&H's contractual rights were going to be assigned to BCOP during the share sale, it was not absurd for BCOP to have approved contractual language setting the triggering date of the noncompetition clause as the termination from LS&H.

Because we conclude as a matter of law that the terms of the agreements, when read as a whole, are not ambiguous and that the triggering date for the noncompetition clause is the termination of employment from LS&H, OfficeMax has not demonstrated a likelihood of success on the merits. Therefore, there is no need to consider the remaining factors of the preliminary injunction analysis. See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 84-85 (1st Cir. 2001). The district court's award of a preliminary injunction is vacated, and the case is remanded. Costs are taxed against appellee OfficeMax, Inc. It is so ordered.