**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 9, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FIRST AMERICAN TITLE INSURANCE
COMPANY; FIRST AMERICAN TITLE
COMPANY, LLC.,

      Plaintiffs - Appellees,

v.                                                                      No. 17-4086

NORTHWEST TITLE INSURANCE
AGENCY; MICHAEL SMITH; KRISTI
CARRELL,

      Defendants - Appellants,

and

JEFF WILLIAMS,

      Defendant.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CV-00229-DN)**
_____

Mary Anne Q. Wood (Stephen Q. Wood, with her on the briefs), Wood Balmforth LLC,
Salt Lake City, Utah, for Defendants-Appellants.

Matthew L. Lalli (Mark O. Morris, Bret R. Evans, and W. Danny Green, with him on the
brief), Snell & Wilmer, L.L.P., Salt Lake City, Utah, for Plaintiffs-Appellees.
_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.

_____

This is an appeal from a large jury award based on breaches of contractual and fiduciary duties by employees of a title company who left to form a competing company and encouraged former coemployees to join them. The plaintiffs below were two wholly owned subsidiaries of First American Financial Corporation: First American Title Insurance Company (FA Company) and First American Title Company, LLC (FA LLC) (collectively Plaintiffs). The defendants below who are appealing the judgment (Defendants) are Michael Smith, Kristi Carrell, and Northwest Title Insurance Agency, LLC. Jeffrey Williams was also a defendant below but is not a party to the appeal. Defendants raise numerous grounds on appeal, many of which have not been adequately preserved or presented. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      BACKGROUND

### A.      Factual History

The individual defendants originally worked for Equity Title Insurance Agency, Inc. Carrell became the vice president and manager of Equity's office in West Jordan, Utah. Smith was Equity's chief operations officer and general counsel. Both signed employment agreements with Equity. Carrell's agreement, executed in August 2003, contained a noncompete clause stating that "[d]uring [her] employment with Equity Title and for a period of one year thereafter, [she] may not participate in any competing title insurance or escrow business within a 40-mile radius of any of Equity Title's offices."

**Aplt. App., Vol. IV at 935.** Smith's agreement, executed in August 2004, limited

Smith's right to compete with Equity during and after his employment there, and

contained a nonsolicitation provision barring him from trying to recruit away Equity

employees.[1] In May 2006 Williams signed an employment agreement with Equity to

serve as the senior vice-president for Equity's escrow operations. It also contained

nonsolicitation and noncompete provisions.

Between 2003 and February 2009, FA Company acquired all of Equity's stock: a

50% share between 2003 and 2005; a 45% share in October 2008; and the remaining 5%

in February 2009. The October 2008 purchase was effected through a Stock Purchase

---

[1] The noncompetition provision read in relevant part:

> During his employment with Equity, and for a period of one (1) year
> thereafter, if terminated for "Cause" . . . , Smith shall not, directly, or
> indirectly, either as an employee, employer, consultant, director, or in any
> other individual or representative capacity, engage or participate in any
> business that is in competition in any manner whatsoever with the business
> of Equity, covering an area in all directions 100 miles from any of the
> offices of Equity. . . . Notwithstanding the foregoing, nothing herein shall
> restrict Smith's right to practice law subsequent to the termination of his
> employment with Equity; provided, however, that Smith shall not be
> employed by any person or entity engaged in the title insurance business.

Aplt. App., Vol. III at 583–84. The nonsolicitation provision read in relevant part:

> During his employment with Equity, and for a period of one (1) year
> thereafter, Smith, on behalf of himself or any other person or entity, shall
> not hire, attempt to hire, recommend for hire, or employ, directly or
> indirectly, any employee of Equity. During this one-year period of time,
> Smith shall not encourage or induce any employee of Equity to resign from
> Equity or assist any other employer in recruiting or hiring any employee
> away from Equity.

*Id.* at 584.

Agreement (SPA). After the final February 2009 purchase, Equity became a wholly owned subsidiary of FA Company.

In November 2012, Equity and FA LLC filed a merger plan with Utah regulators. Merger documents stated that Equity and FA LLC would "merge into a single entity"— which would be FA LLC, a subsidiary of First American Financial Corporation. Aplt. App., Vol. III at 754.

After FA Company acquired all the stock of Equity, employees at the title-company office were required to review various documents, including the First American Employee Handbook (the Employee Handbook) and the Code of Ethics and Conduct (the Code of Ethics). The Employee Handbook required that employees use office equipment only for company business and limited personal matters; it also barred outside business activity competing with First American. The Handbook referred to the Code of Ethics, which contained similar restrictions on the use of company equipment and outside employment. Office records indicate that Smith, Carrell, and Williams reviewed the Employee Handbook and the Code of Ethics.

Smith's efforts to create Northwest began in late 2014. On March 9, 2015, Northwest opened for business and Smith quit his FA LLC job. The following day, Carrell resigned and started at Northwest. Within two weeks, at least 25 other employees defected as well.

### B. Procedural History

FA Company and FA LLC (referred to individually and jointly throughout the litigation simply as First American) promptly sued Northwest, Smith, Carrell, and

4

Williams, alleging, among other things, (1) breach of contract against Smith, Carrell, and Williams (based on their Equity employment agreements, the Employee Handbook, and the Code of Ethics); (2) tortious interference with contract against Northwest, Smith, Williams, and Carrell; (3) breach of fiduciary duty against Smith; (4) tortious interference with economic relations against Northwest; and (5) civil conspiracy against all the defendants.

Before trial Plaintiffs agreed to dismiss some claims and the court granted summary judgment against Plaintiffs on the tortious-interference claims against Carrell and Williams. Plaintiffs also enjoyed some victories. The district court granted them partial summary judgment, holding that (1) the Equity employment contracts had legally transferred to First American; (2) Williams and Carrell—but not Smith—had breached their employment contracts' noncompete provisions; and (3) Smith and Williams had breached their employment contracts' nonsolicitation provisions. The court clarified, however, that it had not "resolve[d] all issues related to validity of the contracts, such as reasonableness of scope and duration; First American's performance; or whether First American suffered damages." *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229-DN, 2016 WL 6091540, at *15 (D. Utah Oct. 18, 2016) (*First American I*). Later it rejected several potential defenses against the enforceability of the Equity employment agreements, the Employee Handbook, and the Code of Ethics, such as unconscionability and alleged material breach by Plaintiffs. *See First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229-DN, 2016 WL 6902473, at *3 (D. Utah Nov. 23, 2016) (*First American II*).

5

At the first phase of the trial, which addressed liability and compensatory damages, the jury found Smith, Williams, and Carrell liable for breach of contract, Smith liable for breach of fiduciary duty, and Smith and Northwest liable for tortious interference with contract; but it found Northwest not liable for tortious interference with business relations and Defendants not liable for civil conspiracy. It awarded Plaintiffs $1.625 million from Smith; $50,000 each from Carrell and Williams; and $1 million from Northwest. After the second phase of the trial, which addressed punitive damages, the jury awarded Plaintiffs an additional $500,000 from Northwest. The court later awarded Plaintiffs attorney fees of almost $2.9 million.

## II.    ANALYSIS

### A.    Standing

Defendants argue that Plaintiffs failed to establish constitutional standing to bring their claims. Although we doubt that Defendants preserved this issue in the district court, constitutional standing is a jurisdictional matter that must be addressed even if raised for the first time on appeal. *See New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

Defendants assert that the district court "erred by disregarding the [Plaintiffs'] burden to each prove their separate and distinct standing to sue for each cause of action." Aplt. Br. at 34. Regarding the breach-of-contract claims, they complain that Plaintiffs "proceeded jointly on the breach of contract claims in the common name of their parent company 'First American,' without even attempting to prove which entity, if any, had the right to enforce the Equity Agreements" and, similarly, that Plaintiffs "did not attempt to

6

prove which entity, if any, was a party to the First American Employee Handbook and Code of Ethics." *Id*. at 36–37. They then add that Plaintiffs "also improperly proceeded jointly as 'First American' on their tortious interference and breach of fiduciary duty claims." *Id.* at 38 (footnotes omitted). Defendants' arguments are misguided.

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.' Those two words confine the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (internal quotation marks omitted). "At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Id*. at 517 (internal quotation marks omitted). Consequently, the elements of constitutional, Article III standing are "(1) injury in fact that is (2) traceable to the defendant and (3) redressable by the court." *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1241 (10th Cir. 2006). As we have noted:

> The purpose of the standing inquiry is not to determine whether a party has *proven* its case but to gauge whether it should be granted access to the federal courts. The focus of the injury element is on ensuring a legitimate dispute between the parties. A plaintiff who is personally harmed has a stake in the litigation and is not a mere intermeddler. For this reason, the issue generally arises in the constitutional or public law context and is rarely implicated in private civil disputes.

*Id.* at 1241–42 (citations omitted).

7

All three elements of constitutional standing are clearly satisfied for the Utah title company that lost key employees and clients to Northwest. There was evidence, which the jury believed, that its business was injured, the injury was caused by Defendants, and damages would provide redress for the injury. We have before us a proper Case or Controversy. There may be some question as to what entity—FA Company, FA LLC, or both—speaks for that Utah title company (although the portion of the record before us shows that the business was part of FA LLC). But that raises the question of who is (are) the real party (parties) in interest, which is not a jurisdictional issue. *See Norris v. Causey*, 869 F.3d 360, 366–67 (5th Cir. 2017) (The defendants' argument that the plaintiffs' claim belonged to the bankruptcy trustee was a real-party-in-interest issue, not a matter of constitutional standing, because they certainly had standing: "The [plaintiffs'] injury is clear: They lost thousands of dollars. They argue that [the defendants'] diversion of funds caused that injury. And this litigation can redress the loss through damages, as the judgment demonstrates."); *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) ("one who sells his interest in a cause of action is not deprived of Article III standing, but he is susceptible to a real-party-in-interest challenge"); *Whelan v. Abell*, 953 F.2d 663, 671–72 (D.C. Cir. 1992); *see generally* 6A Charles Alan Wright et al., Federal Practice & Procedure § 1542, at 468, 471–75 (3d ed. 2010) (distinguishing real party in interest and standing); 13A Charles Alan Wright et al., Federal Practice & Procedure § 3531, at 1, 23 (3d ed. 2008) (suggesting that concept of real party in interest is a better fit than standing in context of private disputes).

To the extent that Defendants are raising a real-party-in-interest issue, they have waived that issue—in two ways. First, by including only a small fraction of the trial transcript in its appendix on appeal, they have precluded this court from examining the factual basis for the real-party-in-interest status of either plaintiff. Second, the parties saw fit to treat both FA LLC and FA Company as one entity, at least for trial purposes, and so stipulated. The district court's preliminary (that is, before opening statements) Instruction No. 8, which is not challenged on appeal, states as follows:

> The plaintiffs and the defendants have stipulated—that is they have agreed—to certain facts. You must therefore treat those facts as conclusively proven. I will now read the stipulated facts:
>
> &ast;  &ast;  &ast;
>
> Over time [FA Company] acquired ownership in Equity, and in 2012, [FA LLC] merged with Equity. *[FA Company] and [FA LLC] are referred to as "First American."*

Aplt. App., Vol. XXIV at 6657 (emphasis added). In sum, Defendants are not entitled to relief on this argument.

### B.    Summary Judgment on Contract Enforceability

Defendants challenge the district court's ruling on Plaintiffs' motion for partial summary judgment that their signed employment agreements with Equity were still in effect when they quit their jobs to work for Northwest. They contend that the agreements' "restrictive covenants . . . were no longer valid and enforceable at the time [Smith, Carrell, and Williams] began working for Northwest . . . ." Aplt. Br. at 41. We are not persuaded.

To begin with, the validity of the contracts was not affected by FA Company's purchase of Equity's stock or the merger of Equity into FA LLC. When FA Company purchased some, then most, then all of Equity's stock, the change in the ownership of Equity's corporate stock did not affect Equity's contract rights or liabilities. *See* 11 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5100 (2011) ("A change in the personnel of the shareholders does not affect the corporate debts, obligations or liabilities."); *Corp. Express Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 407, 412, 414 (Fla. 2003) (purchase of 100% of corporation's stock does not affect enforceability of noncompete provisions of employee contracts); *see also Sachs v. Lesser*, 163 P.3d 662, 674 n.18 (Utah Ct. App. 2007) ("[I]n a stock purchase transaction the corporation's assets remain titled in the [original] corporation's name." (internal quotation marks omitted)), *rev'd on other grounds*, 207 P.3d 1215 (Utah 2009).

Nor does a merger ordinarily in itself affect the rights, liabilities, or validity of a corporation's contracts. At the time of the merger Equity was a Utah corporation and FA LLC was a Delaware limited-liability company. The merger agreement stated that the two entities were being merged "into a single entity pursuant to [the merger agreement] and the applicable laws of the States of Utah and Delaware." Aplt. App., Vol. III at 754.[2] The merger agreement provided that "[a]ll the assets, rights, privileges, powers, immunities, purposes and property (real, personal, intellectual and mixed), of [Equity and

---

[2] After the merger, Equity ceased to exist. *See* Aplt. App., Vol. III at 755 ("[T]he separate existence of [Equity] shall cease . . . and it shall be merged with and into [FA LLC].").

premerger FA LLC], and all debts due to either of them, shall be transferred to and vested in the [postmerger FA LLC entity]." *Id.* at 755. This provision aligns with the corporate law of both Utah and Delaware. *See* Utah Code Ann. § 16-10a-1106(1)(b); *Aetna Life & Cas. v. United Pac. Reliance Ins. Cos.*, 580 P.2d 230, 232 (Utah 1978); Del. Code Ann. tit. 8, § 259(a); *Del. Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077–78 (Del. 2006).

Defendants dispute this settled law, asserting that two opinions from other jurisdictions show that one entity's stock purchase of another entity terminates the acquired entity's contractual employment relationships. But one is unpersuasive and the other is readily distinguishable. In *Joyner Sports Medicine Institute, Inc. v. Stejbach*, a Pennsylvania state trial court held that one entity's stock purchase of another entity terminated certain employees' employment relationships with the acquired entity, thus starting the time period for noncompete provisions in the employees' employment agreements. 45 Pa. D. & C. 4th 242, 245, 250 (Pa. Ct. Com. Pl. Dauphin Cty. 1999). But the court reached this conclusion by ignoring the settled distinction between a stock-purchase agreement and an asset-purchase agreement. *See id.* at 249. We share the doubts of a Pennsylvania federal district court that the decision expresses Pennsylvania law. *See Siemens Med. Sols. Health Servs. Corp. v. Carmelengo*, 167 F. Supp. 2d 752, 759–60 (E.D. Pa. 2001).

The other opinion cited by Defendants is *OfficeMax, Inc. v. Levesque*, 658 F.3d 94 (1st Cir. 2011), in which the court held that a noncompete provision did not carry over to employment by a corporation after its shares were sold. The employees worked for

11

LS&H, all of whose stock was purchased by BCOP. *See id.* at 95. On the eve of the

purchase, BCOP asked LS&H to solicit from the employees noncompetition agreements

applicable for "a period of 12 months after termination of my employment with LS&H."

*Id.* (emphasis omitted). Two days before the purchase was executed, LS&H paid each

employee $2,500 to sign the agreement. *See id.* at 96. The clear import of the agreement

was to prevent the employee from competing with BCOP for a year after the stock

purchase. The preamble stated that the agreement was in anticipation of the purchase: "I

understand that [BCOP] plans to purchase [LS&H]. I execute this Agreement in

contemplation of that transaction, knowing that [LS&H] is tendering the consideration on

behalf of BCOP and intending that my obligations, duties, and promises in this

Agreement are for the benefit of BCOP." *Id.* at 96 (internal quotation marks omitted).

And the agreement indicated that the one-year period was measured from the date of the

sale to BCOP, but the period could be extended in a future agreement:

> I agree that this Agreement shall be freely assignable by [LS&H] to BCOP
> in the event of and upon the closing of the sale of stock of [LS&H] to
> BCOP. *I further agree that if requested by BCOP, and for the
> consideration stated above, I will sign a noncompetition agreement in
> substantially the same form as this Agreement and which names BCOP as
> the employer*.

*Id.* (emphasis added) (internal quotation marks omitted).

There are no circumstances remotely like that in this case. Nothing in the Equity

employment agreements or the circumstances surrounding their execution indicated that

12

they were dependent on who owned Equity. Nothing we say in resolving the issue before us is inconsistent with the decision in *OfficeMax*.[3]

Defendants next argue that Plaintiffs made an admission establishing that their noncompetition contracts did not bar Defendants from joining Northwest. Noting that the contracts restrict their right to compete "[d]uring [their] employment with Equity, and for a period of one (1) year thereafter," they contend that Plaintiffs made a binding judicial admission that their employment with Equity ended in October 2008, when FA Company completed the acquisition of all of Equity's stock, so the one-year restriction on competition ended years before they left for Northwest. The purported admission was the statement in Plaintiff's complaint that "Smith, Williams, and Carrell *became employees of First American* on or about October 16, 2008, *as a result of [the SPA]* . . . ." Aplt. App., Vol. I at 73 (emphasis added). Perhaps this could be read as an allegation that as a

---

[3] Defendants argue that the district court improperly construed the noncompetition agreement by relying on "general corporate purpose" and a mistaken view of the absurdity doctrine. But any such error by the district court is irrelevant at this stage of the proceeding. Our review of contract interpretation is de novo. *See Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1022 (10th Cir. 2014). And we have not relied on either challenged doctrine. Embedded in Defendants' general-corporate-purpose discussion, however, is a distinct argument: Defendants suggest that "[b]y holding that [Defendants] had contractual obligations to both Equity and First American, the court improperly expanded the scope of the restrictive covenants to include a massive company with subsidiaries and offices around the world." Aplt. Br. at 45. This would be a decent argument to prevent expansion of the geographical scope of the noncompetition agreements beyond what was contemplated in the original contracts with Equity. But among Defendants' noncompete provisions, the one with the smallest geographic scope barred competition within 40 miles of any Equity office. When Smith, Carrell, and Williams signed their employment agreements, Equity had an office at 2180 South 1300 East, Salt Lake City, Utah. This is less than a mile from Northwest's future main office at 2150 South 1300 East. Enforcement of the noncompetition agreement in this context is not an improper expansion of the obligation.

13

result of the SPA, Defendants were no longer employees of Equity. But even if this allegation in the complaint (which was denied by Defendants in their answer) could otherwise be considered a binding judicial admission, we decline to treat it as an admission because it is a statement of law rather than fact. We have repeatedly declared that "admissions" of law are ordinarily not binding. *See Z.J. Gifts D-4, L.L.C. v. City of Littleton*, 311 F.3d 1220, 1233 (10th Cir. 2002), *rev'd on other grounds sub nom. City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004); *Gust v. Jones*, 162 F.3d 587, 598 (10th Cir. 1998); *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 715–16 (10th Cir. 1993), *modified on other grounds by Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078 (10th Cir. 1994) (en banc). Plaintiffs contended in their brief on appeal that the assertion in the Complaint "was a legal conclusion as to the effect of the SPA; it cannot be considered a judicial admission." Aplee. Br. at 34. Defendants did not argue to the contrary in their appellate briefs. We therefore reject their judicial-admission argument.[4]

Finally, Defendant Carrell asserts that the district court "failed to recognize that the SPA does not identify [her employment contract] as an enforceable employment agreement." Aplt. Br. at 46 (additional capitalization omitted). The SPA's Representations section has a subsection titled "Material Contracts" stating that, "[e]xcept as set forth in Schedule 2.9(a), [Equity] is not bound by any oral or written contract . . . relating to the employment of any Person." Aplt. App., Vol. XX at 5322

---

[4] For the same reason, we reject Defendants' claim that the district court erred in refusing their proposed Instruction No. 1, which dealt with judicial admissions.

14

(emphasis omitted). Although the employment agreements with Smith and Williams are on the schedule, Carrell's employment agreement is not. The upshot, Defendants argue, is that the Carrell agreement "did not pass to 'First American' as part of the . . . SPA." Aplt. Br. at 46. We beg to differ. The purpose of the Material Contracts subsection was to inform FA Company of various potential obligations of Equity arising from contracts to which it was a party; nothing in the section indicates any intent to disclaim any contracts.

Perhaps Equity did not think that the agreement was material to the company's financial condition. But if it was wrong in omitting that agreement from the schedule, that error does not free Carrell from the rights and duties established by that agreement. After all, Carrell was not a party to the SPA and could not claim any reliance on the omission of her agreement from the schedule. The remedy, if any, for Equity's error would be an action by FA Company against Equity for a material omission of a potential liability in the SPA.

### C. Jury Instructions

Defendants raise numerous complaints about the jury instructions. We first address their complaint that the district court failed to include all or part of their proffered Instruction Nos. 16–18, 46–47, and 78. We need not address the substance of the instructions, because Defendants did not properly object in district court to their omission.

Under Fed. R. Civ. P. 51(c)(1), "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter

15

objected to and the grounds for the objection." And under Fed. R. Civ. P. 51(d)(1), "A party may assign as error: . . . a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." The advisory committee note to the 2003 amendment to the Rule explains why it is not enough simply to tender an instruction:

> Many cases hold that a proper request for a jury instruction is not alone enough to preserve the right to appeal failure to give the instruction. The request must be renewed by objection. This doctrine is appropriate when the court may not have sufficiently focused on the request, or may believe that the request has been granted in substance although in different words. But this doctrine may also prove a trap for the unwary who fail to add an objection after the court has made it clear that the request has been considered and rejected on the merits. [Rule 51(d)(1)(B)] establishes authority to review the failure to grant a timely request, despite a failure to add an objection, when the court has made a definitive ruling on the record rejecting the request.

Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment.

Defendants have failed to point to any place in the record where they satisfied these requirements for properly objecting to any of the omitted instructions: for none of those instructions did they identify the specific instruction and distinctly state the grounds for an objection to its omission. They do, however, argue that they did not need to object because the district court issued a "definitive ruling" rejecting the proposed instructions. They point to the following email from the district court to counsel:

> Counsel,
>
> I attach a copy of the latest version of the proposed jury instructions. We will discuss these Monday afternoon.
>
> These take into account:
> * The parties original proposed instructions

16

- The court's first proposed instructions
- The court's additional ins[t]ructions
- The parties' additional proposals

I apologize for not tracking all the changes from the previous version. It became too messy. Redlining was reserved for modifications of previously proposed instructions. Entirely new instructions have no redlining. Formatting changes are not redlined.

I also attach a separate document with tracked changes that only includes the instruction on lawyers as expert witnesses. This is modified from the instruction I read to the jury because it now deals with two witnesses. The final version of this instruction is included in the large set of instructions.

Aplt. App., Vol. XXIII at 6336 (citations and emphasis omitted).

This is not a definitive ruling as contemplated by the Rule. The most that could be said of the email is that the district court is reporting that it has reviewed the various proposed instructions and is *planning* to give the attached instructions. The email does not state that the court is attaching the *final* jury instructions. It says, "I attach a copy of the *latest version* of the *proposed* jury instructions." *Id.* (emphasis added). And then it states, "We will discuss these Monday afternoon," thereby giving counsel plenty of opportunity to point out errors. *Id.* The district court was hardly setting "a trap for the unwary." Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment.

A district court's simple failure to give a proposed instruction is not a "definitive ruling" that excuses an objection under Fed. R. Civ. P. 51(d)(1). Otherwise a party could comply with Rule 51 simply by tendering proposed instructions, a proposition this court has repeatedly rejected. *See Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1168 n.6 (10th Cir. 2003) ("Merely tendering proposed instructions to a court is insufficient to comply with the strictures of Fed. R. Civ. P. 51."); *Comcoa, Inc. v. NEC Tels., Inc.*, 931

17

F.2d 655, 660 (10th Cir. 1991) ("[T]he offering of a proposed instruction does not preserve a challenge to the court's instructions under Rule 51, absent a specific objection."  (internal quotation marks omitted)); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1515 (10th Cir. 1984) (same), *aff'd*, 472 U.S. 585 (1985).  For the denial of the proposed instruction to be a *definitive* rejection of the argument raised on appeal in support of the instruction, the district court must expressly reject that specific argument.  Absent such a rejection we cannot tell whether the district court might have changed its mind after a proper objection because it had not previously "sufficiently focused on the request, or [believed] that the request [had] been granted in substance although in different words."  Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment.

When there has not been a proper objection to failure to give an instruction, our review is limited to review for plain error.  *See* Fed. R. Civ. P. 51(d)(2).  To establish plain error, one must show "(1) error, (2) which is plain, (3) which affects substantial rights, (4) and which seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1151 (10th Cir. 2012).  But Defendants do not argue plain error in their opening brief.  Ordinarily an appellant's failure to raise an issue in its opening brief waives the issue.  *See In re Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1105 n.2 (10th Cir. 2017).

Defendants' challenges to the instructions that *were* given fare no better.  First, they complain about Instruction Nos. 10 and 29.  But their opening brief makes no effort

18

to show that they preserved their challenges below. And their effort to do so in the reply brief comes up far short. Some of the record citations they provide in support do not even plausibly deal with Instruction Nos. 10 and 29. And of the remaining four citations, two reference their early objections to the *Plaintiffs'* proposed jury instructions, not the court's instructions; the third is to their pleading entitled "Defendants' Corrections to Proposed Jury Instructions," which nowhere specifically discusses Instruction Nos. 10 and 29; and the fourth is to a posttrial new-trial motion, a filing too late to contain a proper Rule 51 objection, *see* Fed. R. Civ. P. 51(b)(1), (c)(2) (timely objections under Rule 51 are to court's proposed instructions and are to be made "before instructing the jury and before final jury arguments").

Defendants' remaining arguments concern the district court's fiduciary-duty instructions. First, they complain that the instruction that fiduciaries must "fully disclose information about matters affecting the principal's business" was "overly broad" because under Utah law, employees, and even lawyers, have a "clear right . . . to plan to compete . . . without disclosing those plans to the employer." Aplt. Br. at 53–54. We note that two of the district court's final instructions address this point. *See* Aplt. App., Vol. XXV at 6683 (Instruction No. 33) ("[B]ecause of society's legitimate interest in encouraging competition, unless there is a contractual or legal obligation to the contrary, an employee may properly plan to go into competition with his employer and may take active steps to do so while still employed and has no general duty to disclose his plans to his employer and, further, he may secretly join other employees in the endeavor without violating any duty to his employer."); *id.* at 6684 (Instruction No. 34) ("In the absence of

19

any agreement or other legal obligation to the contrary, an employee, including a lawyer, may [1] properly plan to go into competition with his employer; [2] take active steps to do so while still employed and has no general duty to disclose his plans to his employer; and [3] secretly join other employees in the endeavor."). In any event, Plaintiffs did not preserve this argument by objecting on this ground to the district court's proposed instructions.

Defendants' other challenges to the court's instructions on fiduciary duty concern an instruction saying that attorneys cannot "represent interests adverse to those of the client during the attorney-client relationship" and cannot "conceal facts . . . nor in any way deceive the client." Aplt. Br. at 54; *cf.* Aplt. App., Vol. XXV at 6700. Defendants argue that this instruction ignored two points of Utah law: that an attorney's fiduciary duties are limited to the representation's scope (the subject of the legal services provided), and that simultaneous representation of clients whose adverse interests are only economic does not require disclosure and consent.

But Defendants did not preserve the simultaneous-representation issue. Although they proffered instructions stating the proposition, they did not object to the district court's failure to give the instructions.

Defendants did specifically object that the instructions should have informed the jury that an attorney's fiduciary duties are limited to matters within the scope of the attorney's representation. What they failed to do, however, was provide any guidance or argument to the district court regarding what is meant by that limitation in the context of an attorney (such as Smith) representing an organization. Defendants were well aware of

20

persuasive authority indicating that the scope of representation is quite broad in that context.  In the report he submitted to Defendants and the court, Plaintiffs' legal-ethics expert explained the applicability of § 96 of the Restatement (Third) of the Law Governing Lawyers.  Section 96(1)(a) states:  "When a lawyer is employed or retained to represent an organization[,] the lawyer represents the interests of the organization as defined by its responsible agents acting pursuant to the organization's decision-making procedures."  And § 96(2) imposes a correspondingly broad duty:

> If a lawyer representing an organization knows of circumstances indicating that a constituent of the organization has engaged in action or intends to act in a way that violates a legal obligation to the organization that will likely cause substantial injury to it, or that reasonably can be foreseen to be imputable to the organization and likely to result in substantial injury to it, the lawyer must proceed in what the lawyer reasonably believes to be the best interests of the organization.

Yet Defendants' objections to the fiduciary-duty instructions made no attempt to provide contrary authority, or even reasoned argument, regarding organizational representation.  Absent an argument explaining why the court's instructions would be incorrect, misleading, or prejudicial in the context of the specific case being tried, Defendants' objections were not adequately presented.  And, to repeat the refrain, Defendants do not argue plain error on appeal.

### D.    Damages

At trial, Plaintiffs' damages expert, Rick Hoffman, testified to the damages suffered by First American.  He assumed, among other things, that Plaintiffs proved their causes of action.  He calculated that First American's lost profits between March and December 2015 were $2,067,000 and that the risk-adjusted lost profits First American

21

would lose over the next ten years was slightly over $14 million.  The jury awarded a

total of $2,725,000.  We can ascertain its thinking from the "Summary of Damages"

section of the special-verdict form, which we quote in full:

> *You were instructed that the amount of damages you award may overlap among the defendants and among the claims, so that the total amount of damages to be awarded to First American need not necessarily be the sum of the damages amounts you have found above, if any, and must not exceed the sum of the damages amounts you have found above, if any.  It is possible that the same damages may be caused by more than one wrongful act and by more than one defendant.  It is possible to find a defendant liable on multiple claims or find several defendants liable on a single claim.*
>
> *Please answer these questions to ensure that double recovery to First American does not occur, but that full recovery to First American is granted.*
>
> 1.     Fill in the amount of damages you awarded for the following claims. If you did not enter damages for a claim, enter "0":

| | |
|---|---|
| Michael Smith breach of contract | $500,000 |
| Jeff Williams breach of contract | $50,000 |
| Kristi Carrell breach of contract | $50,000 |
| Michael Smith breach of fiduciary duty | $600,000 |
| Tortious Interference with Contracts—Michael Smith | $525,000 |
| Tortious Interference with Contracts—Northwest | $1,000,000 |
| Tortious Interference with business relations—Northwest | $0 |
| Civil conspiracy | $0 |

> The total amount of damages to be awarded to First American is $2,725,000.

Aplt. App., Vol. XXIV at 6577–78 (cross-references to verdict-form sections omitted).

Defendants raise several challenges to the damages award. We reject them all. First, they claim that the court committed error in failing to apportion damages between the two Plaintiffs. But as we have already noted, all the parties tried the case without distinguishing between the two entities. And Defendants never made this plaintiff-segregation argument below, nor do they argue plain error on appeal. The issue is therefore waived.

Next, Defendants complain that Plaintiffs' evidence did not apportion the damages by cause of action or defendant. But the evidence necessary to support damages depends on the nature of the case. *See, e.g.*, *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987) ("Evidence of the amount of damages may be circumstantial and inexact. [I]n a case . . . where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation." (internal quotation marks omitted)); *Milgo Elec. Corp. v. United Bus. Commc'ns, Inc.*, 623 F.2d 645, 665 (10th Cir. 1980) (damages calculations containing "a degree of uncertainty" are acceptable when the uncertainty "is a necessary result of the nature of the case"). The same principle applies to apportionment of damages. When the damages are lost profits, the nature of the case generally does not allow pinpointing any particular act by any particular defendant as the cause of any

23

particular dollar of lost profits. All the jury can do is make an informed judgment of how to apportion the loss among causes of action and defendants.[5]

And that is exactly what the jury did here. In the Summary of Damages section of the special-verdict form, the jury set forth the total damages suffered by Plaintiffs as $2,725,000. It then divvied that sum up among the various causes of action and defendants. There was no duplication of damages in this case. If the jury had awarded any duplicative (overlapping) damages, the total amount of damages to be awarded to Plaintiffs would have been less than the sum of the component awards. For example, if the jury thought that the total award against Northwest for tortious interference with contracts ($1 million) encompassed the same damages as those awarded against Smith for tortious interference ($525,000), then it would have reduced the total amount of damages to be awarded to First American by $525,000 ($2,200,000 instead of $2,725,000). True, the district court instructed the jury that it "may take action to ensure that double recovery does not occur," Aplt. App., Vol. XXV at 6710; but there was no need for the jury to take the court up on that offer. The verdict form makes clear that the jury itself was intent on avoiding double recovery. If the court were to reduce any of the component awards on the ground that there was duplication, then First American would not be awarded the total damages found by the jury.

---

[5] We note that the expert did draw a distinction between immediate lost profits and the profits that would accrue in the coming years from losing future business from its customers. Because the total jury award is much closer to the expert's calculation of the amount of immediate lost profits, it appears that the jury associated the claim of tortious interference with business relations, on which it ruled against Plaintiffs, with the alleged loss of future business.

Defendants do make some reasonable observations about the jury awards. They note that the jury awarded $600,000 in lost profits against Smith for breach of fiduciary duties, $525,000 for lost profits against Smith on the tortious-interference claim against him, and $1 million against Northwest for tortious interference with contract, when all three claims are "premised on the same conduct—Smith's breach of fiduciary duty." Aplt. Br. at 60. Perhaps it would have been more logical for the jury to award $1,125,000 against Smith for breach of fiduciary duty and the same amount against Northwest for tortious interference. (The tortious-interference judgment against Smith would necessarily be lower because he could not interfere with his own contract. *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982), *overruled on other grounds by Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015).) But where is the prejudice to Defendants? The jury clearly tried to apportion all the damages to avoid any duplication. If it had done what Defendants apparently would have preferred, each of them would have been jointly and severally liable for a significantly larger judgment. Indeed, Smith and Northwest could each be liable for Plaintiffs' total damages of $2,725,000 (although the court would have to protect them against double recovery once the full amount had actually been paid). That could hardly have been in the interest of any defendant.

The same point can be made about Defendants' contention that "the damages award is inherently inconsistent." Aplt. Br. at 62. For example, they point out that the jury awarded $50,000 each against Carrell and Williams for breach of contract but awarded $525,000 against Smith for his "interference with those same contracts." *Id.*

25

But would Defendants have preferred that the damages awards against Carrell and Williams were larger, instead of having Smith relieve them from much of what could have been their joint and several liability?

In short, it is clear that the jury believed that Defendants' conduct altogether caused First American to lose $2,725,000 in profit. If their apportionment of that sum among Defendants on the various causes of action seems peculiar, we fail to see how Defendants were injured thereby.

### E.    Attorney Fees

Finally, Defendants raise two arguments why the district court's attorney-fee award was in error. "Generally speaking, we review the decision to award attorney fees, and the amount awarded, for abuse of discretion," though any legal analysis underlying the award is reviewed de novo. *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1233 (10th Cir. 2018) (brackets and internal quotation marks omitted).

Defendants' first argument concerns an alleged failure to split up fees by claim. They argue that under Utah law a prevailing party seeking fees must allocate time incurred between compensable and noncompensable claims. Here, they suggest, the only claims for which Plaintiffs were entitled to fees were the breach-of-contract claims against Smith and Williams based on their signed employment agreements—only those contracts had a fees provision—and further, Plaintiffs were only "partially successful" on those claims. Aplt. Br. at 63. Yet Plaintiffs did not segregate their fees by compensable and noncompensable claims. Under Utah law, however, parties need not segregate fees for compensable and noncompensable claims if the claims "sufficiently overlap and

26

involve the same nucleus of facts." *Daynight, LLC v. Mobilight, Inc.*, 248 P.3d 1010, 1013 (Utah Ct. App. 2011). And here, Plaintiffs' breach-of-contract claims "sufficiently overlap with" and "involve the same nucleus of facts" as Plaintiffs' other claims. The essence of this case—as Plaintiffs aptly put the point—is that "multiple high-level employees of First American with non-compete, non-solicitation, and non-disclosure agreements formed, organized, and operated a competing title insurance business in violation of their duties to First American." Aplt. App., Vol. XXVIII at 7604. The conduct through which the individual Defendants violated their contractual obligations plainly overlaps with the conduct underlying the various other causes of action here.

Defendants' second argument is that the fee award was too high. They emphasize that Plaintiffs received only $550,000 in damages on claims for which they were entitled to fees (the breach-of-contract claims), and "were not successful on the majority of their claims and only recovered a fraction of the [$14 million] in damages they requested." Aplt. Br. at 65. But in Utah, "[t]he total amount of the attorneys fees awarded in [a] case cannot be said to be unreasonable just because it is greater than the amount recovered on the contract," and "[t]he amount of the damages awarded in a case does not place a necessary limit on the amount of attorneys fees that can be awarded." *Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988) (internal quotation marks omitted). We may not have awarded the same amount, but we see no abuse of discretion.

## III. CONCLUSION

We **AFFIRM** the judgment of the district court. We **GRANT** Defendants' motion to supplement the appendix.

27