FILED
U.S. Bankruptcy
Appellate Panel of the
Tenth Circuit

August 18, 2020

Blaine F. Bates
Clerk

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

IN RE MICHAEL M. SMITH,

Debtor.

_____

FIRST AMERICAN TITLE INSURANCE
COMPANY and FIRST AMERICAN
TITLE COMPANY, LLC,

Plaintiffs - Appellees,

v.

MICHAEL M. SMITH,

Defendant - Appellant.

BAP No. UT-19-035

Bankr. No. 17-22743
Adv. No. 17-02076
Chapter 7

OPINION

_____

Appeal from the United States Bankruptcy Court
for the District of Utah

_____

Mark Clifford Rose of McKay, Burton & Thurman, Salt Lake City Utah for Appellant
Michael M. Smith.

Matthew L. Lalli of Snell & Wilmer, Salt Lake City Utah for Appellees First American
Title Company, LLC and First American Title Insurance Company.

_____

Before **MICHAEL**, **SOMERS**, and **JACOBVITZ**, Bankruptcy Judges.

_____

**SOMERS**, Bankruptcy Judge.

_____

Michael Smith is an attorney who spent twenty-two years working for Equity Title Insurance Company ("Equity") in Utah, where he rose to the level of Chief Operating Officer and General Counsel. A competitor, First American Title Insurance Company and First American Title Company, LLC (collectively "First American"), purchased a controlling interest in Equity, eventually merging with Equity in 2012, and changed Smith's role to underwriting counsel. Presumably, Smith was no longer happy in his position, and in 2014, Smith and others began to talk of leaving First American to form their own title company.

Smith ultimately resigned from First American in 2015 and opened a competing title agency called Northwest Title. Northwest Title hired twenty-seven former First American employees, who brought with them First American clients. First American then sued Smith and Northwest Title in United States District Court in Utah for breach of contract, breach of fiduciary duty, and tortious interference with contract, and obtained a multi-million-dollar verdict against both. Smith filed a chapter 7 bankruptcy petition and First American sought to have its judgment excepted from discharge under 11 U.S.C. § 523(a)(6) ("willful and malicious injury by the debtor to another entity or to the property of another entity").[1] The Bankruptcy Court entered a judgment excepting the debt owed to First American from Smith's discharge, and he appealed. This Court concludes the Bankruptcy Court did not err in its ultimate entry of judgment and affirms the judgment of the Bankruptcy Court.

---

[1] All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

## I.  Factual and Procedural Background[2]

Smith began his employment with Equity in May 1995, and eventually rose to the position of Chief Operating Officer and General Counsel.[3] On August 15, 2004, Smith executed an employment agreement with Equity.[4] The employment agreement contained a non-compete clause that limited Smith from being employed in the title insurance business, but the clause only applied if Smith was terminated for cause.[5] The employment agreement also included a clause regarding the non-solicitation of employees.[6]

Four years later, on October 16, 2008, First American, which operated a title insurance agency with approximately twenty locations throughout Utah, acquired a controlling interest in Equity's stock, and Smith became an employee of First American on that acquisition date.[7] First American changed Smith's title to State Underwriting and

---

[2] The facts of this case are gleaned from the parties' *Stipulated Pretrial Order* and the Bankruptcy Court's *Amended Memorandum Decision Finding that Defendant's Debt to Plaintiffs is Non-Dischargeable under 11 U.S.C. § 523(a)(6)* ("Memorandum Decision"). The record on appeal does not contain a transcript of the Bankruptcy Court's trial or any trial exhibits, giving this Court no record with which to assess the Bankruptcy Court's findings of fact. Many of the Bankruptcy Court's findings of fact are themselves derived from the District Court case's undisputed findings of fact, which are also not in the record before this Court. The undisputed facts from the District Court are contained in the District Court's decision on a motion for summary judgment regarding the enforceability of the employment agreement, located at *First Am. Title Ins. Co. v. NW Title Ins. Agency*, No. 15-cv-00229-DN, 2016 WL 6902473 (D. Utah Nov. 23, 2016) (unpublished).

[3] Stipulated Pretrial Order at 3, *in* Appellant's App. at 157.

[4] *Id.*

[5] Memorandum Decision at 4, *in* Appellant's App. at 7.

[6] *Id.* at 6, *in* Appellant's App. at 9 (citing testimony supporting the conclusion that Smith "understood the meaning and obligations of the non-compete and non-solicitation agreements in the Equity Employment Agreement").

[7] Stipulated Pretrial Order at 3, *in* Appellant's App. at 157.

3

Legal Counsel; in that position he served as an attorney for the company and owed it a fiduciary duty.[8] In mid-2011, Smith emailed Equity's management team about another attorney employed by First American who was leaving to work for another title company.[9] Smith explained that he believed the employment contract the attorney executed while employed by Equity was enforceable and that First American would seek to enforce the non-compete clause in the attorney's employment contract if the attorney left.[10]

First American and Equity officially merged in October 2012.[11] First American required all employees to take an online training course that outlined the employee handbook and code of ethics and conduct and electronically acknowledge compliance with the policies therein.[12] Smith does not deny acknowledging the employee handbook and code of ethics.[13] The record does not include the specific policies set out in either.

In the spring of 2014, three individuals, one of whom was a co-worker at First American, approached Smith about setting up a new title company, which they proposed Smith would run.[14] By the fall of 2014, an additional First American employee was considering a move and Smith and others began preparing the launch of a new company, including setting up the company's ownership, discussing a partnership with a title

---

[8] Memorandum Decision at 5, *in* Appellant's App. at 8.
[9] *Id.* at 6, *in* Appellant's App. at 9.
[10] *Id.*
[11] *Id.* at 7, *in* Appellant's App. at 10.
[12] *Id.* at 8, *in* Appellant's App. at 11.
[13] *Id.* at 9, *in* Appellant's App. at 12.
[14] *Id.* at 10, *in* Appellant's App. at 13.

underwriter that competed with First American, submitting required documents and forms necessary to formalize the relationship, and obtaining licenses and permits from regulatory agencies.[15] Smith did all these things while still employed as legal counsel for First American.

On January 26, 2015, Northwest Title incorporated, and on February 18, 2015, Northwest Title applied for and received title escrow and title search licenses.[16] Smith "wanted to limit the time between when he resigned and when other First American employees could start at Northwest [Title] so as to maximize the chance that First American employees would come to work for Northwest [Title] and to minimize the opportunity for First American to try and keep the employees at First American."[17] Smith delayed his departure from First American by about a week to give Northwest Title more time to secure leased space for its operations.[18]

On March 9, 2015, Smith resigned from First American.[19] While Smith left no unresolved work at First American, on the day he resigned he took documents from the company with the help of his assistant.[20] The very next day, on March 10, 2015, Northwest Title opened for business in offices next door to First American.[21] Between March 9 and March 23, 2015, twenty-seven First American employees resigned with the

---

[15] *Id.* at 9-12, *in* Appellant's App. at 12-15.
[16] Stipulated Pretrial Order at 3, *in* Appellant's App. at 157.
[17] Memorandum Decision at 16, *in* Appellant's App. at 19.
[18] *Id.*
[19] Stipulated Pretrial Order at 4, *in* Appellant's App. at 158.
[20] Memorandum Decision at 20, *in* Appellant's App. at 23.
[21] *Id.* at 14, 20, *in* Appellant's App. at 17, 23.

intent to begin jobs at Northwest Title.[22] Many of the Northwest Title employees immediately began contacting First American's customers explaining they were moving to Northwest Title, and within three weeks of opening, Northwest Title had 600 orders.[23] Northwest Title profited from at least 150 transactions that were opened at First American but later closed at Northwest Title.[24]

The Bankruptcy Court made findings of fact concerning Smith's intent and state of mind while he was planning to leave First American. The Bankruptcy Court noted Smith alleged that he (1) believed the employment agreement with Equity was no longer binding; and (2) he did not have an employment agreement with First American.[25] But the Bankruptcy Court found Smith understood First American would not be happy with his departure and anticipated a lawsuit upon his departure and starting a competing title company.[26] Smith recognized that he was a lawyer for First American and that First American was his client.[27] Smith also recognized that as its attorney, he owed a fiduciary duty and a duty of undivided loyalty to First American relating to the scope of his representation up until the time he resigned.[28] Smith took steps to conceal his involvement in the formation of Northwest Title to compete with First American.[29] Smith "intentionally concealed his Northwest [Title] business formation activities for the

---

[22] *Id.* at 4-5, *in* Appellant's App. at 158-59.
[23] Memorandum Decision at 22-23, *in* Appellant's App. at 25-26.
[24] *Id.* at 23, *in* Appellant's App. at 26.
[25] *Id.* at 17, *in* Appellant's App. at 20.
[26] *Id.* at 18, *in* Appellant's App. at 21.
[27] *Id.* at 5, *in* Appellant's App. at 8.
[28] *Id.*
[29] *Id.* at 39-40, *in* Appellant's App. at 42-43.

following reasons: (1) [Smith] knew his actions were inconsistent with his legal and ethical duties to First American as its counsel; (2) [Smith] knew that First American would view his actions to set up Northwest [Title] as a threat because of the impact on First American's business and reputation; and (3) [Smith] knew he had to keep his plans secret from First American so he could take twenty-seven employees before First American could respond in a meaningful way to retain such employees."[30] Smith "subjectively knew of the substantial certainty of injury to First American as a result of opening Northwest Title offices in First American's business locations and taking First American's employees and their customer contacts."[31]

On April 3, 2015, First American sued Smith, Northwest Title, and other co-defendants in federal district court for breach of contract, tortious interference with contract, breach of fiduciary duty, misappropriation of trade secrets, and unfair competition.[32] Smith admitted in several emails sent at the time that he was neither surprised nor concerned about the lawsuit.[33] When ruling on First American's motion for summary judgment in the District Court suit, the District Court judge found that Smith's Equity employment agreement remained in force after the Equity/First American merger; Smith breached the non-solicitation provision in the Equity employment contract; the non-compete clause in the Equity contract was only triggered if First American

---

[30] *Id.* at 41, *in* Appellant's App. at 44.
[31] *Id.* at 48, *in* Appellant's App. at 51.
[32] Stipulated Pretrial Order at 5, *in* Appellant's App. at 159.
[33] Memorandum Decision at 24, *in* Appellant's App. at 27.

terminated Smith and thus did not apply; and First American's employee handbook and code of ethics were enforceable contracts.[34]

At conclusion of the District Court trial, the judgment ultimately entered on December 30, 2016, found that Smith had breached three contracts: (1) the non-solicitation agreement in the August 2004 employment agreement that Smith entered with First American's predecessor in interest (Equity), (2) the First American employee handbook, and (3) First American's code of ethics.[35] First American was awarded compensatory damages of $500,000 for these breaches.[36] The jury also found that Smith breached fiduciary duties owed to First American while employed by First American, and the jury found the breach of fiduciary duty was willful and malicious or with knowing and reckless indifference.[37] For these wrongs, the jury awarded $600,000 in compensatory damages.[38] And finally, the jury found Smith tortiously interfered with First American's contracts in a way that was willful and malicious or with knowing and reckless indifference and awarded $525,000 in compensatory damages against Smith.[39] Various additional judgments were entered against Northwest Title and the co-

---

[34] *Id.* at 26, *in* Appellant's App. at 29.
[35] Stipulated Pretrial Order at 5, *in* Appellant's App. at 159.
[36] *Id.*
[37] *Id.* at 5-6, *in* Appellant's App. at 159-60.
[38] *Id.* at 6, *in* Appellant's App. at 160.
[39] *Id.*

defendants.[40] An award of attorneys' fees and costs was also awarded to First American for $3,097,816.36.[41]

On April 4, 2017, Smith filed a voluntary chapter 7 bankruptcy petition.[42] First American filed its adversary proceeding seeking to except the debt owed to it by Smith from discharge under § 523(a)(4) ("fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny") and § 523(a)(6) ("willful and malicious injury by the debtor to another entity or to the property of another entity").[43] In the parties' stipulated pretrial order, First American voluntarily dismissed the § 523(a)(4) claim, limiting the scope of the issues to whether Smith willfully and maliciously injured First American.[44]

## II.     Jurisdiction and Standard of Review

"With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth

---

[40] The jury found that Smith was acting as an agent of Northwest Title when Smith breached his fiduciary duty to First American. The jury then found that Northwest Title tortiously interfered with First American's contracts and that such tortious interference was willful and malicious or in knowing and reckless indifference, and awarded $1,000,000 in compensatory damages against Northwest Title for the breach. An additional $100,000 in compensatory damages was awarded against the co-defendants. A punitive damage award of $500,000 was entered against Northwest Title. *Id.*

[41] *Id.* Smith appealed the judgment in the District Court case to the Tenth Circuit Court of Appeals, which affirmed on October 9, 2018. *First Am. Title Ins. Co. v. NW Title Ins. Agency*, 906 F.3d 884 (10th Cir. 2018).

[42] Stipulated Pretrial Order at 7, *in* Appellant's App. at 161.

[43] *Amended Complaint for Determination of Nondischargeability of Debt*, *in* Appellant's App. at 78-105.

[44] Stipulated Pretrial Order at 2-3, *in* Appellant's App. at 156-57.

Circuit."[45] A bankruptcy court's order resolving all claims asserted in an adversary

proceeding is a final order for purposes of 28 U.S.C. § 158.[46] No party elected for this

appeal to be heard by the United States District Court pursuant to 28 U.S.C. § 158(c).

Accordingly, this Court has jurisdiction over this appeal.

The ultimate determination of whether a debt is nondischargeable pursuant to

§ 523 is a legal question reviewed de novo.[47] However, "[a] determination of whether a

party acted willfully and maliciously necessarily involves inquiry into and finding of

intent, which is a question of fact" reviewed for clear error.[48] Smith also alleges the

Bankruptcy Court erred in its application of the doctrine of issue preclusion. "The

question of [issue preclusion's] availability is subject to de novo review."[49] If issue

preclusion "is available, we review the decision to apply preclusive effect for abuse of

discretion."[50]

---

[45] *Straight v. Wyo. Dep't of Trans. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (quoting 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1)).

[46] *Adelman v. Fourth Nat'l Bank & Tr. Co, N.A., of Tulsa (In re Durability, Inc.)*, 893 F.2d 264, 266 (10th Cir. 1990) (stating that "the appropriate 'judicial unit' for application of [finality] requirements in bankruptcy is not the overall case, but rather the particular adversary proceeding" (citing multiple cases)). First American voluntarily dismissed its claim under § 523(a)(4) and the Bankruptcy Court resolved all claims brought under § 523(a)(6).

[47] *United States v. Victor*, 121 F.3d 1383, 1386 (10th Cir. 1991) (citing *In re Grynberg*, 986 F.2d 367, 369 (10th Cir. 1993)) (interpreting § 523(a)(1)(A)).

[48] *Soutsos v. Johns (In re Johns)*, 397 B.R. 544, 2008 WL 3200096, at *3 (10th Cir. BAP Aug. 8, 2008) (unpublished).

[49] *Cherry v. Neuschafer (In re Neuschafer)*, No. KS-13-030, KS-13-035, 514 B.R. 719, 2014 WL 2611258, at *5 (10th Cir. BAP June 12, 2014) (unpublished).

[50] *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

### III. Analysis

#### a. Nondischargeability under § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." After the United States Supreme Court decided *Kawaauhau v. Geiger*,[51] a circuit split developed regarding whether this exception to discharge is a unitary standard, i.e., analyzing the "willful and malicious" standard as a unit, instead of analyzing willful and malicious as separate prongs of a whole. The Fifth Circuit has held it is a unitary standard, although it ultimately considered willful and malicious separately.[52] Other circuits have struggled with the issue.[53] The majority of circuits expressly consider willful and malicious as separate prongs. [54] Whether the Tenth Circuit applies a unitary or separate standard is

---

[51] 523 U.S. 57 (1998).

[52] *Matter of Miller*, 156 F.3d 598, 603 (5th Cir. 1998) ("Although we will ultimately conclude that under recent Supreme Court precedent, 'willful and malicious injury' is a unitary concept entailing a single two-pronged test, courts have previously analyzed 'willful' and 'malicious' separately. We thus consider them here in turn.").

[53] *See, e.g.*, *MarketGraphics Research Grp., Inc. v. Berge (In re Berge)*, 953 F.3d 907, 915 (6th Cir. 2020) (reviewing circuit split and adopting "the two-pronged approach" for determining whether an injury is willful and malicious); *McClendon v. Springfield (In re McClendon)*, 765 F.3d 501, 505 (5th Cir. 2014) (not addressing the issue head on, but seemingly using a unitary standard and defining a willful and malicious injury as "one where there is either an objective substantial certainty of harm, or a subjective motive to cause harm" (internal quotation omitted)).

[54] *See, e.g.*, *Hough v. USAA Casualty Ins. Co. (In re Margulies)*, 721 Fed. App'x 98, 101 (2nd Cir. 2018) (unpublished) (defining willful and malicious as separate elements to be proven); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1293-94 (11th Cir. 2014) (analyzing willful and malicious separately); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (requiring "three elements—injury, willfulness, and malice"); *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818-19 (1st Cir. 2013) (applying willful and malicious as separate requirements); *Petralia v. Jercich (In re Jercich)*, 238 F. 3d 1202,

unclear: in *Panalis v. Moore (In re Moore)*,[55] the Tenth Circuit defined "willful" and then quoted an Eleventh Circuit case for a definition of "malicious" that comes from that court's definition of "willful."[56] Later cases from the Tenth Circuit, in addition to being unpublished, do not clarify the matter.[57]

This Court concludes that proof of a "willful and malicious injury" under § 523(a)(6) requires proof of two distinct elements – the injury must be both "willful" *and* "malicious." Analyzing and applying "willful" and "malicious" separately is the better approach. It facilitates a more rigorous examination of what is required to satisfy the requirements of § 523(a)(6) and is consistent with most of the caselaw. However, conceptually, whether the unitary or separate element approach is adopted should make no difference. What is required to prove "willful and malicious injury" under § 523(a)(6) should be the same under either approach.

### b. Willful Injury

For an injury to be "willful," there must be a deliberate or intentional injury, not merely "a deliberate or intentional act that leads to injury."[58] "[T]he (a)(6) formulation

---

1208-09 (9th Cir. 2001) (defining willful and malicious separately); *Fischer v. Scarborough (In re Scarborough)*, 171 F.3d 638, 641 (8th Cir. 1999) (defining willful and malicious separately).

[55] 357 F.3d 1125 (10th Cir. 2004).

[56] *Id.*; *see infra* note 98 and the accompanying text.

[57] *E.g.*, *Cocoma v. Nigam (In re Nigam)*, 780 F. App'x 559, 563 (10th Cir. 2019) (unpublished) (quoting *Moore* but not elaborating); *Berrien v. Van Vuuren (In re Berrien)*, 280 F. App'x 762, 766 (10th Cir. 2008) (unpublished) (seeming to apply a unitary standard, but not expressly so stating; not defining willful and malicious separately).

[58] *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply the act itself."[59] A willful injury may be established by direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or by indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur.[60] This is a subjective standard.

The Bankruptcy Court concluded that Smith acted with willful intent to: (1) form Northwest Title to compete directly with First American and (2) hire many of First American's employees.[61] The Bankruptcy Court also concluded Smith "did these acts with the subjective knowledge that these actions, which resulted in the immediate loss of a significant number of First American employees and customers, were substantially certain to result in the particularized harm actually suffered by First American."[62] Smith argues the Bankruptcy Court erred in two ways. First, Smith contends the Bankruptcy Court found only simple harm and not legal injury. Second, Smith argues the Bankruptcy Court's findings of fact do not support a conclusion that an intentional violation of legal rights occurred.

Regarding legal injury, Smith argues that the Bankruptcy Court's findings of harm that Smith knew would be inflicted are all only general, "free market" harms from

---

[59] *Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

[60] *In re Longley,* 235 B.R. 651, 657 (10th Cir. BAP 1999). *See also In re Moore*, 357 F.3d at 1129 (citing *Longley* with approval).

[61] Memorandum Opinion at 38, *in* Appellant's App. at 41.

[62] *Id.*

13

competing businesses, and not a subjective belief that Smith was invading the legal rights

of First American. Smith relies on the Eighth Circuit Court of Appeals' opinion reviewed

by the Supreme Court in *Geiger*.[63] There the Court of Appeals stated a willful injury

meant "a deliberate or intentional invasion of the legal rights of another, because the

word 'injury' usually connotes legal injury (*injuria*) in the technical sense, not simply

harm to a person."[64] The Supreme Court's review of the Eighth Circuit's decision

addressed a single issue: "Does § 523(a)(6)'s compass cover acts, done intentionally, that

cause injury . . . or only acts done with the actual intent to cause injury?"[65] Answering

this question the Supreme Court held debts arising from recklessly or negligently

inflicted injuries are not covered by § 523(a)(6).[66] Contrary to Smith's argument, the

Supreme Court opinion does not address the *type* of injury that must result—legal injury

or general harm.[67]

---

[63] *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848 (8th Cir. 1997).

[64] *Id.* at 852.

[65] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[66] *Id.* at 64.

[67] This Court is addressing "injury" in this portion of its § 523(a)(6) analysis simply because that is where Smith raises the issue. As discussed above, the Eighth Circuit places "injury" within its "willful" element, defining willful injury as stated above. *In re Geiger*, 113 F.3d at 852. The Seventh Circuit discusses "injury" as a separate element, i.e., apart from willful and malicious. In *First Weber Grp. Inc. v. Horsfall (In re Horsfall)*, 738 F.3d 767, 774 (7th Cir. 2013), the Seventh Circuit states there are three elements to a claim under 523(a)(6): "(1) an injury caused by the debtor (2) willfully and (3) maliciously." The Seventh Circuit then looks at injury separately, and at that point defines injury as "a violation of another's legal right, for which the law provides a remedy." *Id.* The Sixth Circuit has a case discussing injury under § 523(a)(6), and appears to designate injury as a separate element, but then uses case law from both willful and malicious to define it further. *Steier v. Best (In re Best)*, 109 Fed. App'x 1, 6 (6th Cir. 2004) (unpublished) ("Lastly, the injury must invade the creditor's legal rights. Section 523(a)(6)'s term willful . . . means a deliberate or intentional invasion of the legal rights

In addition, the Tenth Circuit has not defined injury or harm as requiring proof of a legal injury. Applying Smith's argument would allow any defendant to claim ignorance to a legal harm to avoid having a debt held nondischargeable. Many Tenth Circuit cases hold damages are nondischargeable in situations where the defendant could have claimed he or she did not intend to cause legally recoverable harms, only harms in general.[68]

Regardless, even though Smith classifies the harms recognized by the Bankruptcy Court as "risks inherent in conducting business in the free market" instead of acts that "violate[d] the legal rights of First American,"[69] this argument undermines the facts.

---

of another, because the word injury usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person. The conduct must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice.") (internal quotations and citations omitted)). The bottom line is that this Court addresses injury in its analysis at this juncture only because that is where Smith raises the issue, not because the case law is clear on its definition or placement within the scheme of a § 523(a)(6) action.

[68] *E.g.*, *Berrien v. Van Vuuren (In re Berrien)*, 280 F. App'x 762, 767, (10th Cir. 2008) (unpublished) (holding judgment debts for claims of emotional distress, loss of business opportunity and costs for frivolous criminal and civil proceedings were nondischargeable pursuant to § 523(a)(6)); *Taylor v. Jasper (In re Jasper)*, 312 F. App'x 97, 98-99 (10th Cir., 2008) (unpublished) (applying collateral estoppel to state court's judgment in civil common law finding conduct was willful and malicious); *Hartwood Aviation, Inc. v. Hamilton (In re Hamilton)*, 46 F.3d 1151, 1151 1994 WL 724618, at *1 (10th Cir. Dec. 20, 1994) (unpublished) (affirming holding of *Hartwood Aviation, Inc. v. Hamilton (In re Hamilton)*, 147 B.R. 779 (Bankr. D. Colo. 1992) that state court punitive damages in legal malpractice suit were willful and malicious); *Gulf Ins. Grp. v. Wagner*, 37 F.3d 1509, 1994 WL 551342, at *3 (10th Cir. Oct. 11, 1994) (unpublished) (holding debtors' act of removing mobile home from foundation with "saws-all" was willful destruction of property); *Coats State Bank v. Grey (In re Grey)*, 902 F.2d 1479, 1481 (10th Cir. 1990) (holding debtors' sale of collateral securing indebtedness to bank was willful—but failing to note requirement of "legal" injury).

[69] Appellant's Br. 37-38 (referencing harms of (1) creating a competing title company; (2) loss of employees; (3) disruption to First American's business; (4) damage to First American's reputation; and (5) economic harm resulting from loss of customers).

15

Smith was not just a market competitor—he was a former employee of First American that took twenty-seven long-term employees to start a competing business literally in the office building next door. Furthermore, the Equity employment agreement prohibited the solicitation of employees. This is more than just market competition. Smith fully understood the damage to First American's reputation and operation that would result from his actions.[70] Smith's acts resulted in interference with contract, a legal injury—a violation of First American's legal rights, for which the law provides a remedy.[71]

Regarding Smith's argument that the Bankruptcy Court's findings of fact do not support a holding that an intentional violation of legal rights occurred, Smith contends the Bankruptcy Court's factual findings improperly relied on the District Court jury's verdict on the tortious interference count, which does not support a conclusion that Smith desired harmful consequences. Whether the Bankruptcy Court should have given preclusive effect to the District Court judgment is a question of Utah law.[72] In Utah,

---

[70] Memorandum Decision at 39-41, *in* Appellant's App. at 42-44 (referring to Smith's "concealment of his business activities," Smith's "surreptitious discussions," that Smith "knew his actions were inconsistent with his legal and ethical duties," knew that First American would "view his actions as a threat because of the impact on First American's business and reputation," and knew that he "had to keep his plans secret" so that he could take employees before First American could retain them).

[71] There are certainly bankruptcy courts in the Tenth Circuit that have required a legal injury, *see, e.g.*, *Burris v. Burris (In re Burris)*, 598 B.R. 315, 333 (10th Cir. 2019) (stating that an injury under § 523(a)(6) is a violation of a "legal right, for which the law provides a remedy," and a "violation of a creditor's legal right") (internal quotations omitted)), so even if First American was required to make such a showing, it was done in the Bankruptcy Court.

[72] "[F]ederal common law governs the claim-preclusive effect of a [judgment] by a federal court sitting in diversity." *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). In such cases, "the federally prescribed rule of decision [is] the law that

[i]ssue preclusion applies only when the following four elements are met:

(1) the party against whom preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits.[73]

"[I]ssue preclusion 'prevents the relitigation of issues that have been once litigated and determined in another action even though the claims for relief in the two actions may be different.'"[74] "[W]hat is critical is whether the issue that was actually litigated in the first suit was essential to resolution of that suit and is the same factual issue as that raised in the second suit."[75] The Bankruptcy Court did not err in determining issue preclusion is *available* under Utah law.

To prove intentional interference with contract, Utah requires showing "(1) the defendant intentionally interfered with the plaintiff's existing or potential economic relations (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[76] Intent is defined as "a desire to bring about certain consequences."[77] Smith

---

would be applied by state courts in the State in which the federal diversity court sits." *Id.* (citing multiple Supreme Court cases for this proposition).

[73] *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008).

[74] *Id.* at 966 (quoting *Penrod v. Nu Creation Creme, Inc.*, 669 P.2d 873, 875 (Utah 1983)).

[75] *Fowler v. Teynor*, 323 P.3d 594, 597 (Utah Ct. App. 2014) (quoting *Collins v. Sandy City Bd. of Adjustment*, 16 P.3d 1251, 1253 (Utah Ct. App. 2000)).

[76] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991); *see C.R. England v. Swift Transp. Co.*, 437 P.3d 343 (Utah 2019) (reaffirming *St. Benedict*'s definition of intentional interference with contract includes the element of improper purpose or improper means).

[77] *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015).

claims it was possible for the jury in the District Court case to make a finding of intentional interference with contract without finding the intent to cause injury. Smith claims the intent involved applies to the interference element, not the injurious element. Whether issue preclusion should have been *applied* is a more difficult question, but one this Court does not need to resolve. Regardless of the appropriateness of the application of issue preclusion, the Bankruptcy Court merely noted the District Court's findings as one piece of the whole from which it concluded Smith intended to cause First American's injury. Importantly, the Bankruptcy Court also concluded Smith's statements about First American established "he was neither surprised nor sorry about the injury to First American." [78] Furthermore, relying on two factually similar cases, the Bankruptcy Court reasoned that someone in Smith's position would "subjectively kn[o]w of the substantial certainty of injury to First American as a result of opening Northwest Title offices in First American's business locations and taking First American's employees and their customer contacts."[79] A bankruptcy court may use indirect evidence to support a finding of subjective knowledge,[80] as the Bankruptcy Court did here.

---

[78] Memorandum Decision at 46, *in* Appellant's App. at 49.

[79] *Id.* at 48, *in* Appellant's App. at 51 (summarizing *Patriot Fire Prot., Inc. v. Fuller (In re Fuller)*, 60 B.R. 881, 889 (Bankr. N.D. Ga. 2016) (holding a debtor fired after working for an employer for ten years would understand "how precious each client is to a business . . . and how poaching clients necessarily caused harm" to the employer) and *Diamond v. Vickery (In re Vickery)*, 526 B.R. 872 (D. Colo. 2015) (holding an investment banker who transferred partnership assets to himself subjectively knew his actions would deprive the partnership of over $3,000,000)).

[80] *See Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999) ("Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury."); *Via Christi Reg'l Med.*

Smith also argues that the Bankruptcy Court could not have reasonably concluded that Smith believed at the time he resigned that he was bound by the Equity employment agreements, and therefore the willfulness prong is simply not supported by the record. But from the extensive, thorough reporting of the factual findings in the Bankruptcy Court's written decision, there is ample support for the conclusion that Smith intended (and subjectively knew) he was violating the employment contracts and a legal injury was substantially certain to occur.

To support the findings of willful intent, the Bankruptcy Court relied on the following facts:

• The District Court jury's finding of tortious interference with contract, which required proving Smith intentionally interfered with First American's existing or potential economic relations, with intent being defined as "a desire to bring about certain consequences."[81]

• Smith's intentional concealment of the creation of Northwest Title from First American, with knowledge it would cause strife.[82]

• Smith's intentional solicitation of First American employees that held expertise and customer contacts.[83]

---

*Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, 2000 WL 1275614, at *4 (10th Cir. Sept. 8, 2000) (unpublished) (affirming the bankruptcy court's finding that there was no direct or indirect evidence "from which the Court might infer" the debtor's subjective intent).

[81] Memorandum Opinion at 38, *in* Appellant's App. at 41.

[82] *Id.* at 39, *in* Appellant's App. at 42 (noting Smith's use of his wife's email account to communicate with Northwest Title's partners and his requests to delay filing business formation records to prevent First American from learning about Northwest Title).

[83] *Id.* at 41, *in* Appellant's App. at 44.

• Smith's desire to have a "landing space" for the former First American employees before resigning.[84]

To support its ultimate finding that Smith subjectively knew his actions were substantially certain to cause harm to First American, the Bankruptcy Court relied on the following facts:

• In June 2011, an employee approached Smith about a job offer he received with another title company. Smith informed the employee he would enforce a non-compete provision in the employee's employment contract. When the employee asserted Equity's employment agreement was unenforceable because of the merger with First American, Smith responded it was absolutely enforceable. The Bankruptcy Court found these facts undermined Smith's argument that he believed his Equity employment agreement would not be enforceable.[85]

• Smith hid his plans to leave First American from the company, going so far as to use his wife's email account for communications with his new partners.[86]

• Smith opened up the new title agency in the building next door to his old offices at First American.[87]

• Smith understood the harm that loss of business would cause to a title insurance company when he explained an injunction against Northwest Title "would effectively be a death sentence."[88]

• Smith's new title company employed twenty-seven of First American's employees, all of whom resigned within one month of Smith's resignation.[89]

• Smith's employees contacted First American customers in an attempt to move their files to Northwest Title.[90]

---

[84] *Id.* at 41-42, *in* Appellant's App. at 44-45. Smith wanted to have the new office space up and running so that he and other former First American employees could immediately begin working. *Id.* at 16, *in* Appellant's App. at 19.

[85] *Id.* at 43, *in* Appellant's App. at 46.

[86] *Id.* at 13, *in* Appellant's App. at 16.

[87] *Id.* at 14, *in* Appellant's App. at 17.

[88] *Id.* at 44, *in* Appellant's App. at 47.

[89] *Id.* at 22, *in* Appellant's App. at 25.

[90] *Id.* at 22-23, *in* Appellant's App. at 25-26.

• Smith "conceded" the loss of twenty-seven employees would result in injury to First American unless the employees could be quickly replaced, suggesting he knew hiring the employees would result in harm.[91]

• Smith's "experience and sophisticated understanding of the title industry and the business operations of First American [] establish[ed] that he would have known the harmful impact of taking employees and clients away from his employer."[92]

• Smith demonstrated animus toward First American on numerous occasions after the filing of the lawsuit against him.[93]

The Bankruptcy Court specifically found that Smith "did these acts with the subjective knowledge that these actions, which resulted in the immediate loss of a significant number of First American employees and customers, were substantially certain to result in the particularized harm actually suffered by First American."[94]

Further, as noted briefly above, this Court cannot review the accuracy of those findings of fact, because the record in this appeal does not contain a transcript of the trial, trial exhibits, or any of the records from the District Court case. Thus, it is impossible to determine whether the Bankruptcy Court made erroneous findings of fact.[95] The evidence

_____

[91] *Id.* at 44, *in* Appellant's App. at 47.

[92] *Id.* at 47, *in* Appellant's App. at 50 (comparing the case to *Patriot Fire Prot., Inc. v. Fuller (In re Fuller)*, 560 B.R. 881 Bankr. N.D. Ga. 2016) where the debtor worked with his former employer for some ten years before leaving and soliciting its customers).

[93] *Id.* at 24-25, *in* Appellant's App. at 27-28.

[94] *Id.* at 38, *in* Appellant's App. at 41.

[95] 10th Cir. BAP L.R. 8009-3 ("This Court need not remedy any failure by a party to designate an adequate record. When the party asserting an issue fails to provide a record sufficient for considering that issue, this Court may decline to consider it."); *Anstine v. Centex Home Equity Co. (In re Pepper)*, 339 B.R. 756, 761 (10th Cir. BAP 2006) ("Without a transcript and exhibits from the trial, this court cannot review the bankruptcy court's factual findings and will summarily affirm this decision of the bankruptcy court.")).

summarized by the Bankruptcy Court, however, certainly supports a finding of Smith's willful injury of First American.

### c. Malicious Injury

The Bankruptcy Court determined that an injury is "malicious" under § 523(a)(6) if "the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it."[96] That is not the correct standard to determine whether there is a "malicious" injury. In formulating its definition of "malicious," the Bankruptcy Court relied on *Geiger*[97] and *In re Moore*.[98]

In *Geiger*, the Supreme Court held that a medical malpractice judgment debt, arising from negligent or reckless conduct, does not fall within the § 523(a)(6) willful and malicious exception to discharge.[99] The Supreme Court examined the term "willful" in (a)(6) in determining that reckless or negligent acts do not result in a willful injury.[100] The Supreme Court did not need to, and did not, define the term "malicious."

In *Moore*, a workman was injured in an accident not covered by the debtor's (his employer's) insurance.[101] Prior to the accident, the debtor had fraudulently represented that his company had insurance of a type that would cover the accident.[102] But the debtor did not have any knowledge of and did not participate in the activity that resulted in the

---

[96] Memorandum Decision at 36, *in* Appellant's App. at 39.
[97] *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).
[98] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125 (10th Cir. 2004).
[99] *Geiger*, 523 U.S. at 59, 64.
[100] *Id.* at 61-62.
[101] *In re Moore*, 357 F.3d at 1126-27.
[102] *Id.* at 1127.

accident.[103] The Tenth Circuit, agreeing with the decision of the bankruptcy court that the

debt was not excepted from discharge under § 523(a)(6), focused on and applied the

"willful" element.[104] But the Tenth Circuit also observed that in an Eleventh Circuit case,

*Hope v. Walker (In re Walker)*,[105] "the court concluded the term 'malicious' requires

proof 'that the debtor either intend the resulting injury or intentionally take action that is

substantially certain to cause the injury.'"[106] That definition of malicious was not

necessary to the Tenth Circuit's decision in *Moore* and is *dicta*.[107] Although we are

bound by a holding of the Tenth Circuit, we are not bound by *dicta*.[108] Instead, we apply

---

[103] *Id.* at 1126.

[104] *Id.* at 1128.

[105] 48 F.3d 1161, 1164 (11th Cir. 1995).

[106] *In re Moore*, 357 F.3d at 1129. The quoted language was from *Walker*'s discussion of § 523(a)(6)'s "willful" requirement, not the "malicious" requirement. *Walker* was decided before the Supreme Court clarified the meaning of "willful" in *Geiger*. Putting the quoted language in context, in *Walker* the Eleventh Circuit stated: "The majority of circuits that have addressed this issue have strictly interpreted section 523(a)(6) to require that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury. Only the Ninth Circuit has held that an intent to do the act at issue is sufficient to render the resulting injury 'willful' under section 523(a)(6)." *In re Walker*, 48 F.3d at 1164. With respect to the "malicious" element, the Eleventh Circuit said: "As used in section 523(a)(6), malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Id.* (internal quotations omitted).

[107] "[D]icta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case at hand." *Tuttle v. United States (In re Tuttle)*, 291 F.3d 1238, 1242 (10th Cir. 2002) (internal quotation omitted).

[108] *See United States v. Titties*, 852 F.3d 1257, 1273 (10th Cir. 2017) ("A panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's *dicta*.") (internal quotation and alteration omitted).

the Tenth Circuit's definition of "malicious" adopted in *Dorr, Bentley & Pecha v. Pasek (In re Pasek).*[109] That definition is generally in accord with the caselaw in other circuits.

For an injury to be "malicious," "evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present."[110] "[A]ll the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor."[111] A willful and malicious injury requires more than negligence or recklessness.[112] Six circuit courts have defined the "malicious" element to require an act taken in conscious disregard of one's duties and without just cause or excuse, even in the absence of personal hatred, spite or ill-will,[113] or wrongful and without just cause or excuse.[114] These definitions are similar to the pre-*Geiger* definition of "malicious"

---

[109] 983 F.2d 1524 (10th Cir. 1993).

[110] *Id.* at 1527.

[111] *Id.*

[112] *Geiger*, 523 U.S. at 64.

[113] *MarketGraphics Research Grp., Inc. v. Berge (In re Berge)*, 953 F.3d 907, 915 (6th Cir. 2020) (defining malicious as "conscious disregard of one's duties or without just cause or excuse" (internal quotation omitted)); *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019) (defining malice as acting in "conscious disregard of . . . duties without just cause or excuse" (internal quotation omitted)); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1294 (11th Cir. 2014) ("Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." (internal quotation omitted)); *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013) ("An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." (internal quotation omitted)).

[114] *Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 105 (2nd Cir. 2019) (stating that malicious means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will" (internal quotation omitted)); *Petralia v. Jercich (In re*

adopted by the Tenth Circuit in *In re Pasek*. In *Pasek*, the Tenth Circuit stated: "all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor."[115] For an injury to be "malicious," therefore, the debtor's actions must be wrongful.[116] For example, an act taken with intent to harm an individual who is also a creditor is not "malicious" if the debtor used reasonable force acting in self-defense.[117]

In summary, the totality of the circumstances must be examined to determine if a wrongful state of mind was present in Smith when he caused the injury to First American. Smith first argues the Bankruptcy Court erred by concluding Smith's debt was for malicious injury, because it placed the burden on Smith to prove that his actions were done without justification or excuse. Smith argues the Bankruptcy Court concluded there

---

*Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001) ("A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." (internal quotation omitted)).

[115] *Pasek*, 983 F.2d at 1527.

[116] *In re Snyder*, 939 F.3d at 105 ("Malice may be implied by the acts and conduct of the debtor in the context of the surrounding circumstances, . . . and will be found where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance." (internal quotation omitted)).

[117] *See Doe v. Boland (In re Boland)*, 596 B.R. 532, 546 (6th Cir. BAP 2019) ("While the term willful in § 523(a)(6) addresses the scienter aspect of the debtor's conduct, malice addresses whether the debtor had a legal justification or legal excuse for the otherwise culpable conduct, or acted in conscious disregard of one's duty. For example, a debtor's conduct is willful when the debtor strikes the creditor; but, the debtor's conduct is not malicious if the debtor acted in self-defense or in defense of others.").

was a malicious injury before even addressing a "justification or excuse," and referred to a "justification or excuse" as Smith's "defense" to the action, which implies the Bankruptcy Court had shifted the burden of proving that element to Smith. The creditor/plaintiff in a § 523(a)(6) adversary proceeding bears the burden to prove that a debt is nondischargeable.[118]

Although the Bankruptcy Court did not state the Tenth Circuit's case law on "malicious" under § 523(a)(6) with complete precision, the Bankruptcy Court ultimately applied the law correctly. The Bankruptcy Court repeatedly referenced First American's ultimate burden to prove a malicious and willful injury to support its § 523(a)(6) claim,[119] and the justifications and excuse of a debtor are relevant to determine whether a debtor acted with the culpable state of mind as to the injury the creditor experienced. The Bankruptcy Court referred to justification and excuse as a defense as suggested by Smith in his trial brief.[120] It nevertheless addressed Smith's justifications for his conduct in determining whether First American had satisfied its burden to demonstrate that Smith's conduct was willful and malicious. As stated by the Bankruptcy Court, Smith's

---

[118] *Grogan v. Garner*, 498 U.S. 279, 287 (1991) ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Jones v. Jones (In re Jones)*, 9 F.3d 878, 880 (10th Cir. 1993) ("[T]he objector to discharge has the burden of proving by a preponderance of the evidence that a debt is not dischargeable.").

[119] *E.g.*, Memorandum Decision at 33, *in* Appellant's App. at 36 ("if First American has met its burden of proof under § 523(a)(6)."); *Id.* at 34, *in* Appellant's App. at 37 ("For First American to prevail, it must establish by a preponderance of the evidence that [Smith's] actions constituted both a willful act <u>and</u> a malicious injury"); *id.* at 55, *in* Appellant's App. at 58 ("[T]he Court finds that First American has carried its burden of proof by a preponderance of the evidence[.]").

[120] *Defendant's Trial Brief* at 21-22, *in* Appellant's App. at 152-153.

justifications were: (1) he formed Northwest Title for the purpose of bettering his own employment; (2) he did not intend to harm First American; and (3) he believed he was not subject to the Equity employment agreement, based on the advice of counsel.[121] The first contention is undercut by the overwhelming evidence that Smith's conduct caused willful and malicious injury to First American far beyond what was necessary to better his employment. The second contention was specifically rejected by the Bankruptcy Court's finding that Smith subjectively knew that his actions were substantially certain to cause harm to First American.[122] Finally, Smith's contention that he believed he was not subject to the Equity employment agreement was belied by his interaction with a prior First American employee and that his only advice from "counsel" was actually second-hand from an attorney not engaged to represent him and from whom it was not established that all relevant facts were communicated.[123] Justification and excuse is a part of the totality of the circumstances which the Bankruptcy Court considered. In other words, yes, it is a creditor's burden to prove the malicious and willful elements, including the absence of just cause or excuse, but how could a bankruptcy court know about a justification or excuse theory without a debtor presenting it to the court? The Bankruptcy Court did not impermissibly shift the burden of proof.

Smith relies on *Pasek* to argue that like the debtor therein, he was simply under a mistaken belief that his employment contracts did not prohibit his behavior. In *Pasek*, an

---

[121] Memorandum Decision at 48, *in* Appellant's App. at 51.
[122] *Id.* at 43-48, *in* Appellant's App. at 46-51.
[123] *Id.* at 50-51, *in* Appellant's App. at 53-54.

accounting firm contended that a debtor breached a covenant not to compete that was contained in a partnership agreement, and brought a nondischargeability complaint under § 523(a)(6).[124] The debtor left the accounting firm and opened his own practice, and "[s]everal of his clients followed him."[125] Instigating the debtor's departure were multiple disagreements with firm leadership about policies and billing, among other things.[126] The debtor "was fully aware of the covenant not to compete, but hoped that it was unenforceable based on an opinion from legal counsel."[127]

The Tenth Circuit affirmed the judgment of the lower courts concluding that the accounting firm had not established a willful and malicious injury.[128] The Tenth Circuit noted that a "willful and malicious" injury under § 523(a)(6) "occurs when the debtor, without justification or excuse, and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury."[129] The Circuit Court also noted:

> proof of actual knowledge or reasonable foreseeability of injury do not automatically require the trier of fact to find "willful and malicious" injury. We recognize that there are no absolutes. In each case, evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite "malice" in addition to "willfulness" is present.[130]

---

[124] *Pasek*, 983 F.2d at 1525.
[125] *Id.* at 1525-26.
[126] *Id.* at 1526.
[127] *Id.*
[128] *Id.* at 1525.
[129] *Id.* at 1527.
[130] *Id.*

Ultimately, the Tenth Circuit upheld the finding of the bankruptcy court that the debtor "acted with just cause or excuse based on all the facts and circumstances in the case, giving due regard to credibility of witnesses."[131] In support of that finding, the bankruptcy court relied on the evidence that the accounting firm had sought to materially alter the parties' partnership agreement and attempted to regulate the debtor's personal affairs, that the accounting firm had imposed unreasonable billable hours requirements not envisioned in the parties' agreement, and that the debtor reasonably relied on a legal opinion.[132]

Smith's reliance on *Pasek* is misplaced. In *Pasek*, the accounting firm unilaterally altered the parties' partnership agreement by imposing significant new demands and changing billable hours requirements, both of which could lead a person to reasonably conclude that an agreement was not enforceable. In Smith's case, yes, the Bankruptcy Court noted that Smith *alleged* that he believed his employment contract was no longer binding,[133] but essentially the Bankruptcy Court said: "I don't believe you." The Bankruptcy Court found that Smith never directly spoke with the attorney that reviewed

---

[131] *Id.* at 1528.

[132] *Id.*

[133] Memorandum Decision at 17, *in* Appellant's App. at 20 ("In preparing to leave First American, and in forming Northwest Title as a competitor to First American, [Smith] engaged in the following analysis and alleges that he formed the following beliefs regarding his employment relationship with First American. . . . [Smith] believed that with the transition from Equity Title to First American, coupled with the changes to his job responsibilities and his compensation, that: (1) the Equity Employment Agreement was no longer binding; and (2) that he did not have an employment agreement with First American."). The Bankruptcy Court's findings of fact are merely that Smith alleges that he believed these things, not that the Bankruptcy Court also believed them.

his employment contract,[134] Smith understood there would likely be a fight over the non-solicitation provision, and that Smith had previously opined that the non-compete agreement *was* enforceable. The Bankruptcy Court also recognized that emails sent by Smith suggested his intent to cause First American harm after leaving and that Smith even took satisfaction in First American's plight.[135] In Smith's case, there are no facts in addition to Smith's supposed belief the non-solicitation provision was unenforceable to justify or excuse his actions. Smith demonstrated no justification for the solicitation of First American's employees and customers. Fundamentally, Smith's case is nothing like the debtor in *Pasek*; the Bankruptcy Court found that Smith's explanations were not credible.[136] To the contrary, the Bankruptcy Court found that Smith "knew that his actions were inconsistent with his legal and ethical duties to First American as its counsel."[137]

Smith also argues that the Bankruptcy Court erred by concluding Smith's debt was for malicious injury, because the Bankruptcy Court found it was precluded from

---

[134] *Id.* at 50-51, *in* Appellant's App. at 53-54 (explaining that Smith did not actually retain counsel to review the employment agreement). Other factual findings suggest Smith did not necessarily believe the employment agreement was unenforceable, but that he would simply out-litigate First American. *Id.* at 24, *in* Appellant's App. at 27 (quoting an email where Smith stated, "We have some of the best employment law specialists in the state representing us.").

[135] *Memorandum Decision* at 25-26, *in* Appellant's App. at 27-28 (see email statements). The Bankruptcy Court recognized the emails were sent after First American filed its lawsuit against Smith, but concluded they evidenced an "attitude of retribution against First American." *Id.* at 45, *in* Appellant's App. at 48.

[136] *Id.* at 40, *in* Appellant's App. at 43.

[137] *Id.* at 41, *in* Appellant's App. at 44.

considering Smith's justifications by the District Court's findings.[138] First, this Court

disagrees with Smith's premise: the Bankruptcy Court did not refuse to consider Smith's

justification or excuse theories. The Bankruptcy Court specifically addressed them and

rejected them. It acknowledged the District Court judge had already concluded the

employment agreements remained in force, Smith knew about the employee handbook

and Code of Ethics that prohibited his conduct, and Smith did not deny knowing those

things. The District Court jury also concluded Smith had tortiously interfered, which

required the jury to find that Smith intentionally interfered, through an improper means,

and caused injury.

Regardless, the Bankruptcy Court also considered the totality of the facts and

rejected Smith's justification or excuse. Independent of the District Court's judgment, the

Bankruptcy Court stated:

> But based on the totality of the facts regarding the Debtor's experience in the
> title industry; his understanding of the consequences to a title company's
> reputation and cash flow from the disruption of its business; his
> understanding of the issues of employees going to work for a competitor title
> company; his feelings of animosity towards First American; and his
> testimony at trial as to his knowledge of the substantial certainty of harm
> from taking employees and business from First American; the Court finds
> that the Debtor subjectively knew that his actions were substantially certain

---

[138] Smith argues the Bankruptcy Court erred by applying issue preclusion to the District Court's findings on (a) the enforceability and application of the underlying employment agreements, which should not have informed the Bankruptcy Court's beliefs on Smith's subjective beliefs about the enforceability of the agreements and (b) the tortious interference with First American's contracts, which has as an element "improper means," which case law equates as "the functional equivalent" of unexcused or unjustified.

31

to cause harm, and thus that he acted with the requisite malicious intent under § 523(a)(6).[139]

None of those findings relies on applying issue preclusion of the District Court's judgment. The Bankruptcy Court independently concluded, based on the totality of facts, that Smith acted with wrongful, malicious intent. As noted consistently throughout, this Court has no basis for questioning that assessment of Smith's credibility and subjective beliefs.[140] The Bankruptcy Court, in painstaking detail, discussed multiple facts supporting its findings, and the evidence summarized by the Bankruptcy Court supports a finding of Smith's malicious injury of First American.

## IV.    Conclusion

Smith failed to include a transcript, trial exhibits, or any records from the District Court proceeding in the record on appeal, making it impossible to find error in the Bankruptcy Court's extensive and well-articulated factual findings. Smith's allegations of legal error are unpersuasive, and the Bankruptcy Court's decision is AFFIRMED.

---

[139] *Id.* at 49-50, *in* Appellant's App. at 52-53. Again, the Bankruptcy Court did not state the "malice" prong correctly, as discussed above, but it is indisputable that the facts the Bankruptcy Court relied on demonstrate a wrongful, malicious state of mind.

[140] *See supra* note 2.